

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

**JUN 0 7 2011**

~~CLERK~~

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| TAMI SKROVIG, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, deceased, | CIV. 10-4022 |
| Plaintiff, | OPINION AND ORDER |
| vs. | |
| BNSF RAILWAY COMPANY, a Delaware Corporation, | |
| Defendant. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending is Skrovig's motion (1) to compel answers to certain questions posed to Nick Seiter during his deposition, (2) to permit Skrovig to ask followup questions, (3) to compel Seiter to bring to his deposition his case summary report, and (4) to allow Skrovig to examine Seiter about the summary report.[1]  Skrovig also requests sanctions including costs and attorneys' fees associated with this motion and with an additional deposition pursuant to Federal Rules of Civil Procedure 30(d)(2) and 37(a)(5).  BNSF resists the motion asserting that the target of the motion to compel is opinion work product which is absolutely immune from discovery.[2]

---

[1]Doc. 65.

[2]Doc. 70, p. 9.

## BACKGROUND AND FACTS

On August 21, 2007, Thomas Skrovig was traveling south in a Toyota Tundra pickup truck on 465th Avenue in Minnehaha County, South Dakota. At the same time a railway maintenance vehicle owned and operated by BNSF Railway Company was traveling west on BNSF's railroad tracks approaching the intersection between the road and the railroad tracks. Skrovig's pickup was struck on the driver's side and Skrovig was fatally injured.[3]

On March 16, 2010, Tami Skrovig, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, sued BNSF for negligently causing the death of her husband.[4] On June 8, 2010, Skrovig served interrogatories and requests for admission on BNSF.[5] BNSF objected to Interrogatory 7 which asked BNSF to "[i]dentify any investigation conducted by Defendant or any individual(s) hired by Defendant concerning the allegations contained within the Plaintiff's Complaint."[6] On September 30, 2010, Skrovig served its third set of requests for production on BNSF.[7] BNSF objected to a request which asked for production of documents "reviewed by, created by, or provided to" Nick Seiter "during the course of his investigation."[8] "During the next three months, the parties exchanged correspondence regarding the discoverability of the privilege log

---

[3]Doc. 66.

[4]Doc. 1.

[5]Doc. 66, p. 2.

[6]Doc. 66, p. 2.

[7]Doc. 66, p. 3.

[8]Doc. 66, p. 3.

2

documents."[9] The lawyers for each party also conferred by telephone about the disputed discovery.[10] On April 5, 2011, Nick Seiter was deposed.[11] During the deposition BNSF objected to certain questions, and Skrovig now seeks an order directing Seiter to respond to those questions located on the following pages and lines:[12]

● 22: 2 – 22: 20.  On August 21, the day of the accident, Seiter visited with several people.[13] Seiter denied interviewing people, but acknowledged visiting with several people.  Counsel for Skrovig posed the same question about three persons: "tell me what the conversation was with __ ___."  Those three persons are Randy Miller, Mark Vick, and Dwight Wise.  Counsel for BNSF objected to each question and said the same objection and direction not to answer would apply to anybody Seiter talked to as part of his investigation.

● 25: 8 – 26: 2.  Skrovig's counsel inquired of Seiter if he made any determination or measurements as to how far the ballast regulator [14] penetrated into Thomas Skrovig's pickup truck. After Seiter said he did not measure, a colloquy occurred between counsel about work product when Skrovig's counsel asked Seiter if he "determined" the distance of penetration into the pickup by the BNSF vehicle.  Counsel for BNSF objected.  Counsel for BNSF asked Seiter foundational questions

---

[9]Doc. 66, p. 3.

[10]Doc. 66, p. 4.

[11]Doc. 66, p. 4.

[12]Doc. 65.

[13]Also see deposition transcript p. 21, line 23-25 and p. 22, line 1 (Doc. 67-1).

[14]The BNSF vehicle is called a Kershaw Ballast Regulator or simply a ballast regulator. Doc. 66, p. 1.

to establish that the "interview [of] the various witnesses or at least . . . [the] discussions with them" and Seiter's "conclusions or determinations or opinions" were the result of instruction from counsel for BNSF. BNSF retained outside counsel on the same day as the collision occurred, August 21, 2007.[15] It was Seiter who called and retained counsel for BNSF "after being notified of the accident and driving to the scene."[16] The following day Seiter and counsel met in person at the Denver airport.[17]

- 29: 5 – 29: 13. Seiter was asked whether he concluded some tracks on the road were from the pickup, or whether they just might have been on the road before the accident. A work product objection was interposed.

- 31: 8 – 31: 16. Seiter was asked the reason for moving the ballast regulator to the east side of the crossing after it was placed back on the tracks. A work product objection was interposed.

- 34: 1 – 34: 6. Seiter was asked why he "didn't take any pictures from inside the ballast regulator that day when you went riding." A work product objection was interposed.

- 56: 15 – 57: 6. Seiter was asked whether he determined when the driver of the ballast regulator would first see a vehicle on the road approaching the crossing from the north, and the same question was posed with respect to distances of 25 feet, 50 feet or 100 feet before reaching the road. A work product objection was interposed. Seiter was then asked whether he was able to determine when a driver on the road approaching the crossing from the north would first be able to see a ballast regulator approaching the crossing from the east. A work product objection was interposed.

---

[15]Doc. 70, p. 5.

[16]Doc. 70, p. 5.

[17]Doc. 70, p. 5.

4

## ARGUMENTS OF THE PARTIES

**The Test.**

There is no dispute about the case precedent which governs:

> [T]he test should be whether, in light of the nature of the document and *the factual situation* in the particular case, the document can be fairly said to have been prepared or obtained *because of the prospect of litigation*. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared *in the regular course of business* rather than for purposes of litigation.[18]

The disagreement is in the application of the facts to the test. Skrovig argues that Seiter's investigation was conducted in the regular course of business. BNSF argues Seiter's investigation was conducted because of the prospect of litigation.

**Skrovig's Argument.**

Skrovig supports her argument with references to Seiter's letter to Tami Skrovig, the decedent's widow, and to his deposition testimony. A sentence in the letter dated ten days after the accident states:

> It is my responsibility as a Claim Representative for the BNSF Railway to thoroughly investigate and gather information on this unfortunate accident involving your husband Tom.[19]

On April 5, 2011, Seiter testified:

> Q (by Mr. Evans): I mean, tell me what your duties and responsibilities are as a senior claims agent.
> A: The claims department works for the law department. Railroads are self-insured so anything where there may be liability against the railroad such as personal injuries to employees, third parties, property damage accidents, grade crossing accidents. **I work with counsel to investigate.**[20]

---

[18]*Simon v. G.D. Searle*, 816 F.2d 397, 401 (8th Cir. 1987)(italics added).

[19]Doc. 66, p. 2.

[20]Doc. 66, p. 4 (bold in original).

Seiter also testified that he opens 50-200 investigation files each year for BNSF.[21]

Finally, Skrovig argues that Seiter would have conducted this investigation regardless of the prospect of litigation:

> Q (By Mr. Evans): Did anyone tell you at the accident scene before you commenced your investigation that there was going to be a lawsuit filed against Burlington Northern?
> A: There was no lawyer at the accident that said, "I'm going to sue the BNSF Railway".
>
> Q: Or did anybody say that?
> **A: It's an assumption anytime there's a serious accident that we're going to get sued.**
>
> Q: Your job description is to investigate accidents involving Burlington Northern Railroad, correct?
> . . .
> **A: I investigate accidents for the railway.**
>
> Q: That's your job, correct, part of it?
> A: Part of it.
>
> **Q: And that's *regardless* if there's any litigation, correct?**
> **A: *Correct.*[22]**

Skrovig argues the discovery rules are given broad and liberal treatment.[23] "The use of the words "because of" withholds the protection of the work-product privilege from those documents which would have been assembled regardless of whether litigation had been instituted."[24] Skrovig asserts the possibility of litigation is not enough to trigger protection of Seiter's investigation under the work

---

[21]Doc. 66, p. 4.

[22]Doc. 66, p. 7 (bold and italics in original).

[23]Doc. 66, p. 8, citing *Poulos v. Summit Hotel Properties, LLC*, 2010 WL 2640396, at *2 (D.S.D. 2010) (quoting *Credit Lyonnais, S.A. v. SGC Int'l, Inc.*, 160 F.3d 428 (8th Cir. 1998)).

[24]Doc. 66, p. 10, citing *Lamar Advertising of South Dakota, Inc. v. Kay*, 267 F.R.D. 568, 576 (D. S.D. 2010).

product doctrine.[25] "Even if documents might also help in preparation for litigation, they do not qualify for protection where they were not created because of actual or impending litigation."[26] Skrovig asserts "the mere involvement of an attorney in the ordinary business activities of a party cannot legitimately shield those activities from discovery."[27] Skrovig argues that litigation did not occur until approximately two-and-a-half years after the accident, the investigation began an hour after the accident, there were no contacts from lawyers representing the Skrovigs before the investigation and no one suggested there would be litigation.[28] Skrovig argues Seiter's assumption there would be litigation "sweeps too broadly."[29] ". . . To assume that litigation may ensue from any accident may not be unreasonable, but the concept that the mere occurrence of an accident constitutes anticipation of litigation has been soundly rejected by the authorities cited herein."[30] To support its argument the investigation was conducted in the regular course of business, Skrovig

---

[25]Doc. 66, p. 10, citing *Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 2002 WL 1067446, at *2 (D. Kan. April 18, 2002) and *Mission Nat. Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986).

[26]Doc. 66, p. 11, citing  *Lamar Advertising*, 267 F.R.D. at 576 and *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 660 (S.D. Ind. 1991) ("Not only must the documents have been produced when litigation was justifiably anticipated, but the material must have been produced because of that prospect of litigation and for no other purpose."). (internal quotation marks and brackets omitted).

[27]Doc. 66, pp. 11-12, citing *Mission Nat'l. Ins. Co. v. Lilly,* 112 F.R.D. 160 (D. Minn. 1986) and *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977).

[28]Doc. 66, pp. 13-14.

[29]Doc. 66, p. 13-16, citing *Lamar Advertising,* 267 F.R.D. 568;  *Mission*, 112 F.R.D. 160; and *American Home Assur. Co. v. U.S.*, 2009 WL 3245445 (D. N.J. October 7, 2009).

[30]Doc. 66, p. 15, citing *American Home Assur. Co. v. U.S.*, 2009 WL 3245445 at *2 (D. N.J. October 7, 2009).

points to BNSF's internal policies which prevent changes to the scene of an accident until representatives from the claims department have investigated.[31]

**BNSF's Argument.**

BNSF asserts the work product doctrine prevents Skrovig from discovering both the conclusions derived from Sieter's investigation and the Crossing Accident Case Summary.[32] BNSF relies on FED. R. CIV. P. 26(b)(3).[33] Rule 26(b)(3), BNSF correctly observes, creates two classes of work product, i.e. ordinary work product which is not discoverable unless the seeking party has a substantial need for the materials and cannot obtain the substantial equivalent by other means, and opinion work product which is almost absolutely immune from discovery.[34]

BNSF argues that "[w]here the work product of the attorney is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach."[35] BNSF argues the deciding factor is that it immediately retained defense counsel as soon as Seiter became aware of the serious nature of the accident.[36] BNSF cites case precedent supporting the proposition that investigations conducted by railroad claims agents are protected

---

[31]Doc. 66, p. 18.

[32]Doc. 70, p. 1.

[33]Doc. 70, pp. 1-2.

[34]Doc. 70, p. 2.

[35]Doc. 70, p. 3, citing *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1977).

[36]Doc. 70, p. 4.

8

attorney work product.[37]   BNSF asserts the seriousness of the accident makes it particularly

appropriate to conclude the investigation was in anticipation of litigation.[38]   Skrovig "has been

provided or obtained the factual information of Seiter's investigation in his deposition."[39]   But BNSF

argues Skrovig is not "entitled to any of the conclusions or mental impressions of Seiter or retained

defense counsel."[40]   These mental impressions and conclusions are absolutely protected because they

are opinion work product, according to BNSF.[41]

## ANALYSIS

The ultimate competing facts are that Seiter retained outside defense counsel to represent

BNSF on the day of the accident because of the serious nature of the accident, but on the other hand

Seiter would have investigated this accident as part of his regular job responsibilities anyway.  While

most or all of Seiter's investigation occurred after defense counsel was retained, it is apparent that

not all, or perhaps not even any, of the particulars of his investigation were tasks he was specifically

directed to perform by defense counsel, e.g. telephone calls Seiter made to other BNSF employees

on a need to know basis--- such as Seiter's boss and the BNSF employee in charge of equipment and

---

[37]Doc. 70, pp. 5-8, *Almaguer v. Chicago, Rock Island & Pacific Railroad Co.*, 55 F.R.D. 147
(D. Neb. 1972), *Eoppolo v. National R.R. Passenger Corp.*, 108 F.R.D. 292 (E.D. Pa. 1985), *Lagace v. New England Cent. Railroad*, No. 3:06 CV 1317 (RNC), 2007 WL 2889465 (D. Conn.), *Gargano v. Metro-North*, 222 F.R.D. 38 (D. Conn. 2004), and *Smith v. National R.R. Passenger Corp.*, 22 Va. Cir. 348 (Va. Cir. Ct. 1991).

[38]Doc. 70, p. 8, citing *Fontaine v. Sunflower Beef Carrier, Inc.*, 87 F.R.D. 89 (E.D. Mo. 1980).

[39]Doc. 70, p. 9.

[40]Doc. 70, p. 9.

[41]Doc. 70, p. 9.

the like; Seiter's measurements and opinions about distances from the point of impact where each of the drivers could see the other vehicle; who to interview and what to ask; which pictures to take and whether to make a video recording. In other words Seiter, a trained and experienced claims investigator, retained counsel to represent BNSF but by all appearances decided for himself the particular tasks to perform and methods to use during his investigation. After his investigation Seiter and his boss, without legal counsel, met with Tami Skrovig to try to settle the case to prevent litigation.[42] This fact suggests two conclusions: (1) Seiter anticipated litigation, but (2) his investigation was not solely because of the prospect of litigation. "Indeed, one of the purposes of an early investigation is to establish contact with a potential claimant with a view toward keeping the case under control and therefore avoid litigation."[43]

Only the work product doctrine has been urged by BNSF, i.e. the attorney client privilege is not a part of this dispute. The beginning point for analysis is *Simon v. G.D. Searle*.[44] The work product doctrine is expressed in FED. RULE OF CIV. P. 26(b)(3).[45] The work product doctrine will not protect documents from discovery unless they were prepared in anticipation of litigation.[46] Whether the documents were prepared in anticipation of litigation is a factual determination.[47]

---

[42]Doc. 67-1, deposition transcript pp. 60-65 & 70-73.

[43]*Airheart v. Chicago and North Western Transportation Company*, 128 F.R.D. 669, 671 (D.S.D. 1989).

[44]*Simon v. G.D. Searle*, 816 F.2d 397(8th Cir. 1987).

[45]*Simon* at 400.

[46]*Simon* at 401.

[47]*Id.*

10

The facts are:

Seiter is a full time employee of BNSF whose job title is claims representative and whose job responsibility includes the investigation of accidents for BNSF. Each year he opens more than 50-200 investigation files.[48] The majority of his investigations involve injuries to BNSF employees.[49] Over his thirteen years as a BNSF claims representative he has investigated "quite a few" fatality incidents, only one of which was an employee of BNSF.[50] Seiter investigated this accident beginning on the day of the accident. The investigation included Seiter's observations, measurements, photos, witness interviews, and taking written statements. After arriving on the scene of the accident Seiter called "our attorney out of Lincoln, told him the location, what happened."[51] Seiter also called his manager out of Fargo.[52] Seiter retained defense counsel because of the seriousness of the accident. "And after them phone calls, [Seiter] would have followed [BNSF's counsel's] instructions."[53] The "interview [of] the various witnesses or at least . . . [the] discussions with them" and Seiter's "conclusions or determinations or opinions" were the result of instruction from counsel for BNSF.[54]

---

[48]Doc. 67-1, deposition transcript p. 13.

[49]Doc. 67-1, deposition transcript p. 13.

[50]Doc. 67-1, deposition transcript p. 13.

[51]Doc. 67-1, deposition transcript p. 19.

[52]Doc. 67-1, deposition transcript p. 19.

[53]Doc. 67-1, deposition transcript p. 19.

[54]Doc. 67-1, deposition transcript pp. 26-27.

11

There is no evidence in the record about the specifics of counsel's instructions to Seiter, i.e. to take photos or which photos to take, to take measurements or which measurements to take, to interview witnesses or which witnesses to interview, what questions to ask, and the like. Seiter's job description is to investigate accidents involving Burlington Northern Railroad and he would have investigated this accident regardless of any litigation.

Seiter arrived on the scene about noon and left after quitting time.[55] After the lawsuit was started Seiter went to the scene again with defense counsel and an accident reconstruction expert.[56] While at the scene on the day of the accident Seiter:

● visited with several people, namely Tom Neeser, Randy Miller, Mark Vick, Dwight Wise, Michael Carolan, Steve Holm, Burton Risty, Kenny Aaker, one of the policemen, Seiter's director, and Glenn Newby the BNSF person in charge of roadway equipment.[57]

● took measurements with a wheel.[58]

● took pictures.[59]

● made observations about the vehicle battery, tracks on the road, the view from the railroad tracks, the ballast regulator and other associated equipment. [60]

---

[55]Doc. 67-1, deposition transcript pp. 17 & 38.

[56]Doc. 67-1, deposition transcript pp. 42-43.

[57]Doc. 67-1, deposition transcript p. 21.

[58]Doc. 67-1, deposition transcript p. 22.

[59]Doc. 67-1, deposition transcript p. 25.

[60]Doc. 67-1, deposition transcript pp. 28-33.

- made a 20 second video recording.[61]

- made notes of distances and made one sketch.[62]

- made observations about impact between the two vehicles.[63]

Seiter wrote a letter to Mrs. Skrovig after the accident "to get settlement negotiations moving forward to prevent a lawsuit."[64] Also after the accident Seiter and his boss met with Tami Skrovig and her brother in response to a telephone call from Tami Skrovig after she received Seiter's letter.[65] They talked about the accident, looked at pictures, talked a little bit about fault, and settlement money.[66]

Skrovig has been provided or has obtained the factual information contained in Seiter's investigation file. Skrovig has Seiter's complete claim file except for documents removed from it on the grounds of privilege.[67] Certain opinions or determinations or conclusions not known to anyone except BNSF resulted from Seiter's investigation. A Crossing Accident Case Summary was prepared as a result of Seiter's investigation. The accident happened on August 21, 2007. Skrovig's lawsuit was filed on March 16, 2010.

---

[61]Doc. 67-1, deposition transcript p. 33.

[62]Doc. 67-1, deposition transcript p. 39.

[63]Doc. 67-1, deposition transcript p. 40.

[64]Doc. 67-1, deposition transcript p. 57.

[65]Doc. 67-1, deposition transcript p. 60.

[66]Doc. 67-1, deposition transcript pp. 62-71.

[67]Doc. 67-1, deposition transcript p. 23.

Documents prepared in the regular course of business, i.e. not because of the prospect of litigation, are discoverable.[68] Federal law governs application of the work product doctrine in federal courts.[69] Courts must narrowly construe privileges and must avoid suppressing probative evidence.[70] "Notes and memoranda of an attorney, *or an attorney's agent*,[71] from a witness interview are opinion work product entitled to almost absolute immunity."[72] An attorney's notes of a witness interview are opinion work product because "when taking notes, an attorney often focuses on those facts that she deems legally significant."[73] Documents placed in possession of lawyers and business documents sent to corporate officers are not automatically privileged.[74] Although litigation might ultimately result in the future and . . . "[i]t may be conceded . . . that material may be assembled in anticipation of litigation even though no suit has actually been filed. . . . [t]he work product rule does not come into play merely because there is a remote prospect of future litigation."[75] Where liability for an

---

[68]*Simon v. G.D. Searle*, 816 F.2d at 401 ("The work product doctrine will not protect these documents unless they were prepared in anticipation of litigation").

[69]*Pepsico, Inc. v. Baird, Kurtz & Dobson LLP,* 305 F.3d 813, 817 (8th Cir. 2002).

[70]*Pepsico,* citing *Univ. Of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577 (1990).

[71]The parties have not addressed the issue about Seiter's agency relationship. He is a full time employee, i.e. agent, for BNSF. The issue about his agency relationship with retained defense counsel is not addressed in this opinion. It is presumed for purposes of deciding whether the work product doctrine applies that Seiter was the agent of retained defense counsel, i.e. this decision turns on the application of the "because of the prospect of litigation" or "in the regular course of business" test.

[72]*In re Green Grand Jury Proceedings,* 492 F.3d 976, 981-982 (8th Cir. 2007), citing *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th. Cir. 2000) (emphasis added).

[73]*Id.*

[74]*Pepsico* at 816.

[75]*Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977).

accident is probable and a death results "a reasonable person would expect litigation to ensue."[76]

It has been suggested that the analysis ask two questions:[77]

(1)    Were the documents prepared in the ordinary course of business . . . .?

(2)    Was there an independent business purpose for which the document would have been prepared even if there had been no litigation anticipated?

If the answer to either question is yes, then there is no need to accord the document work product protection.

"Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach."[78] On the other hand, "the mere involvement of an attorney, in the ordinary business activities of a party, cannot legitimately shield those activities from discovery."[79]

## RULINGS

### Parts(1) and (2) Of Skrovig's Motion To Compel Answers To Certain Questions Posed To Nick Seiter During His Deposition.

- Skrovig's motion to compel regarding the questions and objections on page 22: 2 – 22: 20 is GRANTED. Skrovig's motion to permit Skrovig to ask followup questions

---

[76]*Schipp v. General Motors Corp.,* 457 F.Supp.2d 917, 923 (E.D. Ark. 2006).

[77]*Millennium Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins. Co.,* 2011 WL 1466428 (D. Md.)., quoting from 2 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK PRODUCT DOCTRINE 826 (5th ed. 2007)("Epstein")(emphasis and ellipsis in original).

[78]*Marvin Lumber v. PPG Industries, Inc.,* 168 F.R.D. 641, 645 (D.Minn.,1996), citing *Diversified Industries, Inc. v. Meredith* at 610.

[79]*Marvin Lumber* at 646.

15

regarding the questions and objections on page 22: 2 – 22: 20 is likewise GRANTED.

On August 21, the day of the accident, Seiter visited with several people. Counsel for Skrovig posed the same question about three persons with whom Seiter visited: "tell me what the conversation was with _____." Those three persons are Randy Miller, Mark Vick, and Dwight Wise. The other persons Seiter interviewed at the scene on August 21, 2007, are: Tom Neeser, Randy Miller, Mark Vick, Dwight Wise, Michael Carolan, Steve Holm, Burton Risty, Kenny Aaker, one of the policemen, Seiter's director, and Glenn Newby the BNSF person in charge of roadway equipment.

BNSF has failed to establish that these interviews or any of them would not have occurred in the regular course of Seiter's investigation, but occurred only because defense counsel instructed Seiter to interview these persons because of the prospect of litigation. It is true that BNSF elicited foundational testimony that Seiter's interview of the various witnesses or at least the discussions with them and Seiter's conclusions or determinations or opinions were the result of instruction from counsel for BNSF. But counsel's two general, conclusory questions and Seiter's simple response "yes you would have" are not enough foundation to overcome other contrary undisputed facts. Seiter's full time job with BNSF is to investigate accidents in the regular course of his job responsibilities as a BNSF claims representative. He would ordinarily be expected to interview persons following any accident. Seiter was not instructed by counsel to interview these witnesses. Indeed, BNSF has not established that the persons interviewed were eye witnesses or were witnesses who had personal information about the facts of the accident. More than one of the witnesses were other employees of BNSF. Consequently, the subjects of these conversations are not notes and

16

memoranda of an attorney's agent from witness interviews which constitute opinion work product. Additionally, there was an independent business purpose for these interviews different from the prospect of defending litigation. That purpose was to investigate the accident to evaluate liability and damages toward the end of controlling and settling the claim to prevent litigation. Applying the two question analysis suggested by Epstein:

    (1)    Were these interviews conducted in the ordinary course of business?

            Yes.

    (2)    Was there an independent business purpose for which the document would have been prepared even if there had been no litigation anticipated?

            Yes.

- Skrovig's motion to compel regarding the questions and objections on pages 25: 8 – 26: 2 is GRANTED. Skrovig's motion to permit Skrovig to ask followup questions regarding the questions and objections on pages 25: 8 – 26: 2 is likewise GRANTED.

After Seiter said he did not measure, a colloquy occurred between counsel about work product when Skrovig's counsel asked Seiter if he "determined" the distance of penetration into the pickup by the BNSF vehicle. BNSF has failed to establish that this determination of the distance of penetration into the pickup by the BNSF vehicle would not have occurred in the regular course of Seiter's investigation, but occurred only because defense counsel instructed Seiter to make the determination of penetration and defense counsel did so only because of the prospect of litigation. First, counsel's foundational questions did not address this issue. Second, because Seiter's full time job with BNSF is to investigate accidents in the regular course of his job responsibilities as a BNSF claims representative he would ordinarily be expected to make pertinent observations and

determinations of this nature following any accident. Additionally, there was an independent business purpose for Seiter to make observations and determinations of this nature different from the prospect of defending litigation. That purpose was to investigate the accident to evaluate liability and damages toward the end of controlling and settling the claim to prevent litigation. Applying the two question analysis suggested by Epstein:

(1) Was Seiter's determination of the distance of penetration into the pickup by the BNSF vehicle, if any there was, in the ordinary course of business?

Yes.

(2) Was there an independent business purpose for which the determination of the distance of penetration was made even if there had been no litigation anticipated?

Yes.

● Skrovig's motion to compel regarding the questions and objections on page 29: 5 – 29: 13 is GRANTED. Skrovig's motion to permit Skrovig to ask followup questions regarding the questions and objections on page 29: 5 – 29: 13 is likewise GRANTED.

Seiter was asked whether he concluded some tracks on the road were from the pickup or whether they just might have been on the road before the accident. Seiter's full time job with BNSF is to investigate accidents in the regular course of his job responsibilities as a BNSF claims representative. He would ordinarily be expected to make pertinent observations and determinations about tracks on the road surface following any crossing accident between a motor vehicle and a BNSF vehicle. Additionally, there was an independent business purpose for Seiter to make observations and determinations of this nature different from the prospect of defending litigation. That purpose was to investigate the accident to evaluate liability and damages toward the end of

18

controlling and settling the claim to prevent litigation. Applying the two question analysis suggested by Epstein:

(1)     Was Seiter's determination about tire tracks on the road as being from the pickup involved in the accident, or not, in the ordinary course of business?

Yes.

(2)     Was there an independent business purpose for which the determination was made about tire tracks on the road as being from the pickup involved in the accident, or not, even if there had been no litigation anticipated?

Yes.

• Skrovig's motion to compel regarding the questions and objections on page 31: 8 – 31: 16 is DENIED.

Seiter was asked the reason for moving the ballast regulator to the east side of the crossing after it was placed back on the tracks. This item of Seiter's investigation can be uniquely connected to this investigation and to Seiter's anticipation of litigation. A reasonable person could expect litigation to ensue under the circumstances of this death related accident. Seiter said he anticipated litigation and he retained counsel the day of the accident early in his investigation. Trying to replicate the circumstances of the ballast regulator's approach to the point of impact involves the prospect of litigation. At the very least this part of Seiter's investigation is intertwined with non-litigation business purposes of the investigation, if not solely because of the prospect of litigation. Applying the two question analysis suggested by Epstein:

19

(1)     Was Seiter's simulation of the accident circumstances by putting the ballast regulator back on the track on the east side of the road part of his investigation in the ordinary course of business?

Maybe there was a regular course of business component, but Seiter's decision to try to simulate the accident circumstances was at least in part because of the prospect of litigation if not solely because of the prospect of litigation.

(2)     Was there an independent business purpose for simulating the circumstances of the accident by putting the ballast regulator back on the track on the east side of the road even if there had been no litigation anticipated?

Maybe there was a regular course of business component, but Seiter's decision to try to simulate the accident circumstances was at least in part because of the prospect of litigation if not solely because of the prospect of litigation.

• Skrovig's motion to compel regarding the questions and objections on page 34: 1 – 34: 6 is DENIED.

Seiter was asked why he didn't take any pictures from inside the ballast regulator that day when he rode in the ballast regulator during his investigation.  Seiter's riding in the ballast regulator during his investigation is simulating the circumstances of the accident, which in turn is unique to this investigation and not something an investigator would probably do during most investigations without regard to litigation.  A reasonable person could expect litigation to ensue under the circumstances of this death related accident.  Seiter said he anticipated litigation and he retained counsel the day of the accident early in his investigation.  Trying to replicate the circumstances of the ballast regulator's approach to the point of impact involves the prospect of litigation.  At the

20

very least this part of Seiter's investigation is intertwined with non-litigation business purposes of the investigation, if not solely because of the prospect of litigation. Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach. Applying the two question analysis suggested by Epstein:

(1)     Was Seiter's decision not to take pictures from inside the ballast regulator while riding in it during a simulation of the accident circumstances in the ordinary course of business?

Maybe there was a regular course of business component, but Seiter's decision not to take pictures from inside the ballast regulator while riding in it during a simulation of the accident circumstances was at least in part because of the prospect of litigation if not solely because of the prospect of litigation.

(2)     Was there an independent business purpose for simulating the circumstances of the accident by putting the ballast regulator back on the track on the east side of the road even if there had been no litigation anticipated?

Maybe there was a regular course of business component, but the motivation for Seiter's decision not to take pictures from inside the ballast regulator while riding in it during a simulation of the accident circumstances was at least in part because of the prospect of litigation, if not solely because of the prospect of litigation, and if in fact there was a deliberate decision not to take pictures.

● Skrovig's motion to compel regarding the questions and objections on pages 56: 15 – 57: 6 is DENIED.

Seiter was asked whether he determined when the driver of the ballast regulator would first see a vehicle on the road approaching the crossing from the north, and the same question was posed

21

with respect to distances of 25 feet, 50 feet or 100 feet before reaching the road. Seiter was also asked whether he was able to determine when a driver on the road approaching the crossing from the north would first be able to see a ballast regulator approaching the crossing from the east. A reasonable person could expect litigation to ensue under the circumstances of this death related accident. Seiter said he anticipated litigation and he retained counsel the day of the accident early in his investigation. Trying to replicate the circumstances of the ballast regulator's approach to the point of impact involves the prospect of litigation. At the very least this part of Seiter's investigation is intertwined with non-litigation business purposes of the investigation, if not solely because of the prospect of litigation. Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach. Applying the two question analysis suggested by Epstein:

(1)     Were Seiter's conclusions about the distance from the point of impact each driver would probably have been able to see the other in the ordinary course of business?

Maybe there was a regular course of business component, but these observations were made at least in part because of the prospect of litigation if not solely because of the prospect of litigation.

(2)     Was there an independent business purpose for Seiter to make a conclusions about the distance from the point of impact each driver would probably have been able to see the other even if there had been no litigation anticipated?

Maybe there was a regular course of business component, but he motivation for the summary was at least in part because of the prospect of litigation if not solely because of the prospect of litigation.

22

**Parts (3) and (4) of Skrovig's Motion To Compel Seiter To Bring To His Deposition His Case Summary Report And To Allow Skrovig To Examine About It.**

Skrovig's motion to compel Seiter to bring to his deposition his case summary report is DENIED.

A Crossing Accident Case Summary was prepared as a result of Seiter's investigation. At the very least this summary about the results of Seiter's investigation is intertwined with non-litigation business purposes of the investigation, if not solely because of the prospect of litigation. Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach. Applying the two question analysis suggested by Epstein:

(1)     Would a Crossing Accident Case Summary be prepared as a result of Seiter's investigation in the ordinary course of business?

Maybe there was a regular course of business component, but the summary was prepared at least in part because of the prospect of litigation.

(2)     Was there an independent business purpose for Seiter to make a conclusions about the distance from the point of impact each driver would probably have been able to see the other even if there had been no litigation anticipated?

Maybe there was a regular course of business component, but the motivation for the summary was at least in part because of the prospect of litigation.

**Skrovig's Motion For Sanctions Including Costs and Attorneys' Fees Associated With This Motion And With An Additional Deposition Pursuant To Federal Rules of Civil Procedure 30(d)(2) and 37(a)(5).**

Skrovig's motion for sanctions is DENIED. BNSF's objections were substantially justified. Even with respect to the parts of Skrovig's motion which are granted, the fact determinations about the line of demarcation between regular course of business and work product doctrine are close enough so that it was reasonable for BNSF to interpose objections.

## ORDER

IT IS HEREBY ORDERED that Skrovig's Motion to Compel (Doc. 65) is GRANTED IN PART and DENIED IN PART as stated above.

Dated this ___7___ day of June, 2011.

BY THE COURT:

John E. Simko
United States Magistrate Judge

24