UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| TAMI SKROVIG, as Personal Representative of the Estate of THOMAS JEFFREY SKROVIG, deceased,<br><br>        Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation,<br><br>        Defendant. | CIV. 10-4022<br><br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff Tami Skrovig, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, hereby submits her Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 76).

## **INTRODUCTION**

This case arises out of an August 21, 2007 grade crossing accident between a vehicle operated by the deceased, Thomas Skrovig, and a maintenance machine owned and operated by Defendant BNSF Railway Company ("BNSF"). BNSF moves this Court for an order granting summary judgment on the grounds that some of Plaintiff's claims are subject to federal preemption and that Thomas Skrovig's alleged contributory negligence bars all of Plaintiff's claims. As set forth below, BNSF's arguments in favor of federal preemption are misguided and do not preclude Plaintiff's claims in this action. Furthermore, genuine issues of material fact exist as to Thomas Skrovig's alleged contributory negligence, and whether such alleged negligence was more than slight in comparison with the negligence of BNSF. Accordingly,

1

BNSF is not entitled to judgment as a matter of law and Plaintiff requests the Court to deny

Defendant's Motion for Summary Judgment in its entirety.

## RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. Admitted.

2. Denied.  Genuine issues of material fact exist as to the speed of the ballast regulator
   as it approached and traveled into the grade crossing.  Police reports prepared by the
   Minnehaha Sheriff's Department indicate that the operator of the ballast regulator,
   Dwight Wise, reported a speed of between 10-15 mph at the time of the accident.
   (Eden Aff. ¶ 2 Ex. A).  Mr. Wise later changed this estimate during his deposition to
   5 mph hour.  (Wise Dep. at 53:  1 – 53:  8).  Plaintiff admits that operator Dwight
   Wise testified that he "tooted his horn," but there was no evidence to suggest that he
   followed the Federal Railroad Administration's horn blow requirements.  (Eden Aff.
   ¶ 3 Ex. B, Noyce Report at 8).

3. Admitted.

4. Admitted.

5. Admitted.

6.  Admitted.

7. Admitted.

8. Plaintiff admits that Mr. Wise testified to that opinion.

9. Plaintiff admits that BNSF has retained an expert who has expressed that opinion.

10. Admitted.

11. Plaintiff denies that the crossbucks were in compliance with the Manual on Uniform
    Traffic Control Devices as to the required reflective material.  As noted by Plaintiff's
    expert David Noyce, the requirement for a strip of retroreflective white material, not
    less than 50 mm (2 in) in width on each support at passive highway-rail grade
    crossings for the full length of the front and back of the support from the Crossbuck
    sign, did not exist.  (Eden Aff. ¶ 3 Ex. B, Noyce Report at 4-5).

12. Admitted.

Even if all twelve of Defendant's "material facts" were undisputed, genuine issues of

material fact would still exist as to the speed of Thomas Skrovig's vehicle, the ability of the

drivers to perceive and react to each other, and the negligence of BNSF's ballast regulator operator for failing to keep a proper lookout, operate his machine safely, and yield the right of way to vehicular traffic.  As set forth below, these disputed issues of material fact preclude judgment in BNSF's favor as a matter of law on either preemption or contributory negligence grounds.

## FACTUAL BACKGROUND

On August 21, 2007, Thomas Skrovig was traveling south in a red Toyota Tundra pickup truck on 465th Ave. in Minnehaha County, South Dakota.  (Doc. #37 ¶ 6).  Contemporaneously, a maintenance machine owned and operated by BNSF known as a Kershaw Ballast Regulator ("ballast regulator") was traveling west on BNSF's railroad tracks in Minnehaha County in a direction approaching the tracks' intersection with 465th Ave.  *Id.* ¶ 7.  The Skrovig vehicle and the ballast regulator collided as they simultaneously traversed the BNSF at-grade railroad crossing with 465th Avenue.  *Id.* ¶ 8.  The railroad vehicle struck the Toyota Tundra on the driver's side, impaling the vehicle, and pushed the truck approximately 50 feet in a westerly direction along the railroad.  (Eden Aff. ¶ 2-3 Ex. A & B, Noyce Report at 1).  Thomas Skrovig was fatally injured in the accident.

465th Avenue in Minnehaha County is a two-lane gravel road extending in a north-south direction.  The speed limit on 465th Avenue is 55 mph.  The roadway grade at the railroad crossing at issue was approximately flat, with wood railroad ties used north, south, and between the rails to bridge the roadway across the rails.  (Eden Aff. ¶ 3 Ex. B, Noyce Report at 1).  The northwest quadrant of the intersection contained a cemetery with the perimeter lined by a chain-linked fence.  *Id.* at 2.  Corn fields were present in the northeast, southeast, and southwest quadrants of the 465th Avenue/BNSF railroad intersection.  *Id.*  The Minnehaha County Sheriff's

Department reported that the corn was "seven feet tall or more." (Eden Aff. ¶ 2 Ex. A). Later field measurements of the corn found tassel heights exceeding eight feet. (Eden Aff. ¶ 3 Ex. B, Noyce Report at 2).

The ballast regulator that struck Thomas Skrovig's vehicle is a roadway maintenance machine used for moving and shaping ballast along the railway. (Wise Dep. at 22: 17 – 23: 22). It is yellow in color with white and black equipment mounted to the top of the vehicle. (Eden Aff. ¶ 4 Ex. C). Its height is approximately 9.75 feet, with a small piece of equipment mounted on the top at a height of approximately 11.75 feet. (Eden Aff. ¶¶ 3, 5 Ex. B, Noyce Report at 6 & D). The front end of the machine sticks out approximately 18 feet in length ahead of the machine operator's cab. (Eden Aff. ¶ 5 Ex. D). The height and overall size of the ballast regulator is significantly less than a typical locomotive operated by BNSF over the crossing at issue. (Eden Aff. ¶¶ 3, 6 Ex. B, Noyce Report at 7 & E). According to information provided by BNSF, locomotives used by the railroad at this particular crossing range in height from approximately 15.5 to 16.0 feet. *Id.* Thus, the ballast regulator is at least six feet shorter than a BNSF locomotive, and, as noted by one of Plaintiff's experts, its overall size is approximately 400 percent smaller than a BNSF locomotive. (Eden Aff. ¶ 7 Ex. F, Edwards Report at 2).

On September 10, 2007, the operator of the ballast regulator that collided with Thomas Skrovig's vehicle, Dwight Wise, was reprimanded by BNSF for violating one of its internal safety rules, BNSF Maintenance of Way Operating Rule ("MWOR") 6.50.2. (Wise Dep. 79: 12 – 19, 85: 23 – 86: 14). MWOR 6.50.2 relates to the safe use of on-track equipment like a ballast regulator and provides as follows:

4

6.50.2  Approaching Road Crossings

> On-track equipment must approach all grade crossings prepared to stop
> and must yield the right of way to vehicular traffic.  If necessary, flag the
> crossing to protect movement of on-track equipment.

(Eden Aff. ¶ 8 Ex. G)

On March 16, 2010, Plaintiff Tami Skrovig, as Personal Representative of the Estate of

Thomas Jeffrey Skrovig, commenced an action against BNSF for negligently causing the death

of her husband.  (Doc. 1).  Following preliminary discovery, Plaintiff later amended her

Complaint on October 1, 2010.  (Doc. 37).  As set forth in Plaintiff's Amended Complaint, it is

alleged that BNSF was negligent in a number of particulars, including (1) failure to provide

sufficient warning to the general public of the approach of the ballast regulator, (2) failing to act

in compliance with its own policy of stationing employees at the grade crossings prior to the

approach of the ballast regulator, (3) failing to act in compliance with its own policy of yielding

the right of way to vehicular traffic at grade crossings, (4) operating the ballast regulator at an

unsafe speed as it approached the grade crossing, and (5) generally failing to keep a proper

lookout and keep the ballast regulator under proper control to avoid the collision with Thomas

Skrovig's vehicle.  (Doc. 37 ¶¶ 13-16).

During his deposition, ballast regulator operator Dwight Wise testified that as he

approached the grade crossing prior to the accident, the presence of the corn fields prevented him

from observing whether there were any vehicles traveling either north or south on 465th Ave.

(Wise Dep. at 50:  11 – 50:  13, 52:  4 – 52:  10).  He further testified that could not see the road

until he was right at or in the grade crossing.  (Wise Dep. at 96:  1 – 96:  3).  Nevertheless, he

decided to enter the crossing without knowing that the roadway was clear.  (Wise Dep.  at 54:  8

– 54:  11).  Mr. Wise testified, however, that he did see Thomas Skrovig's vehicle before he

entered the crossing.  (Wise Dep. at 105:  11 – 105:  18).  He also admitted that under BNSF's

rules, he was required to yield the right of way to vehicular traffic, and that in this case, he did

not yield the right of way to Thomas Skrovig.

> Q (by Mr. Eden):  Based upon your training with BNSF and your experience as a
> ballast regulator operator, what is the policy for when you approach a grade
> crossing with this machine?
>
> A (by Mr. Wise):  Slow down to yield right-of-way to the public.
>
> Q:   When you say "yield right-of-way," you mean you're supposed to slow down
> to a point and allow any oncoming traffic to go ahead of you?
>
> A:  Correct.

(Wise Dep. at 41:  3 – 41:  10).

> Q (by Mr. Eden):  In this case you did not yield the right-of-way to Mr. Skrovig's
> vehicle. Correct?
> . . .
> A (by Mr. Wise):  **Correct. I didn't yield**, according to this.

(Wise Dep. at 91:  10 – 91:  18) (emphasis added).

BNSF now seeks summary judgment as to some of Plaintiff's claims based upon the

theory of federal preemption and summary judgment as to all of Plaintiff's claims on the grounds

that Thomas Skrovig's alleged contributory negligence bars Plaintiff's recovery.  As set forth

below, federal preemption in this case is inappropriate and genuine issues of material fact exist

sufficient to preclude summary judgment on BNSF's claim of contributory negligence.

## ARGUMENT AND AUTHORITY

### I.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P 56.  This remedy, however,

"is an extreme remedy, and should not be entered unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and unless the other party is not entitled to recover under any discernible circumstances." *Kegel v. Runnels*, 793 F.2d 924, 927 (8th Cir. 1986). In making this determination, the Court must view the evidence in the light most favorable to the nonmovant, affording that party the benefit of all reasonable inferences that can be drawn therefrom. *Reich v. Hoy Shoe Co., Inc.,* 32 F.3d 361, 364 (8th Cir. 1994). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## II.  BNSF's Arguments for Federal Preemption Should Be Rejected

### a.  *General Overview of Federal Preemption*

Federal preemption applies when a state statute conflicts with or frustrates federal law. If such a conflict exists, the state law must give way to the federal law according to the Supremacy Clause of the United States Constitution. U.S. Const., Art. VI, cl. 2. The issue of preemption arose in the area of railroads in 1970, when Congress enacted the Federal Railroad Safety Act ("FRSA") to address the steep rise in collisions at railroad grade crossings. 49 U.S.C. § 20106. Through the FRSA, Congress specifically directed the Secretary of Transportation to prescribe regulations for railroad safety, and provided that States could adopt or continue to enforce any law or rule of its own until the Secretary "prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* In other words, state common law may still govern in negligence and wrongful death cases unless the Federal Government has enacted a regulation to "cover" the subject matter in question. However, a state "may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when

the law, regulation, or order" "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." *Id.*

On August 3, 2007, Congress passed an Amendment to the FRSA intended to clarify its position regarding state law causes of action and the FRSA's preemptive effect.  This "Clarification Amendment" provided that "[n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property alleging that a party"

> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b) (2007).

Because of the potential for unintended encroachment on the authority of the States, there is a strong presumption against preemption, and a court will only apply preemption if "it is the clear and manifest purpose of Congress."  *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993).  Furthermore, to prevail on a claim that federal regulations have a pre-emptive effect, a petitioner "must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."  *Id.* at 664 (internal citations omitted).  "Evidence of pre-emptive

purpose is sought in the text and structure of the statute at issue." *Id* (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983)).  "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Id.*

> **b.  *Plaintiff's Claims Regarding BNSF's Failure to Yield, Failure to Keep Proper Lookout and Proper Control, and Failure to Operate at a Safe Speed are Not Preempted***

In evaluating BNSF's argument in favor of federal preemption, it is critical to recognize the specific allegations that BNSF has challenged.  According to its brief in support of its motion, BNSF contends that three of Plaintiff's claims are preempted by federal law:  (1) claims based on the adequacy of warnings signs at the crossing, (2) claims that BNSF should have complied with its internal policy regarding the use of flagmen at the crossing, and (3) claims related to vegetation.  (Doc. 77).  BNSF has *not* brought a preemption challenge with regard to Plaintiff's claims that BNSF was negligent by failing to stop the ballast regulator and act in compliance with its own policy of yielding the right of way to vehicular traffic at grade crossings, operating the ballast regulator at an unsafe speed as it approached the crossing, and generally failing to keep a proper lookout and keep the ballast regulator under proper control to avoid the collision with Thomas Skrovig's vehicle.  (Doc. 37 ¶¶ 13-16).

Recognition of BNSF's decision not to challenge the aforementioned claims is significant in that it demonstrates the key distinction between Plaintiff's claim and many other federal preemption claims involving a grade crossing accident:  the lack of specific regulations regarding the safe use of the railroad machine at issue.  For example, pursuant to 49 C.F.R. § 213.9, federal regulations set maximum allowable operating speeds for both freight trains and passenger trains.

These speed limits vary depending on the type of track identified.  *Id.*  For instance, the track at issue in this case is classified as a Class 2 track, which has a maximum operating speed of 25 mph for freight trains and 30 mph for passenger trains.  *Id.*  The regulations set forth in 49 C.F.R. § 213.9, however, apply exclusively to *trains* and not to railroad maintenance machines like a ballast regulator.  Indeed, the United States Supreme Court has held that the maximum allowable speeds codified at 49 C.F.R. § 213.9(a), "cover[ ] the subject matter of *train speed* with respect to track conditions, including conditions posed by grade crossings," and therefore, preempt common law tort claims asserting that a *train* has traveled at an excessive rate of speed.  *Easterwood*, 507 U.S. at 675, 113 S.Ct. at 1743.[1]

In the instant case, Plaintiff's claims do not relate to the operation of a train, but to the operation of a ballast regulator.  Accordingly, no preemption can occur under 49 C.F.R. § 213.9 regarding Plaintiff's claims related to the speed of the ballast regulator or the operator's failure to slow down and stop the ballast regulator prior to entering the grade crossing.  Likewise, Plaintiff's claim that BNSF is negligent for failing to keep and maintain a proper lookout and keep the ballast regulator under proper control to avoid the accident are also unclaimed by preemption as BNSF has failed to identify any federal regulations that would "cover" these claims.

---

[1] Ballast regulator operator Dwight Wise testified in his deposition that while working on the railroad as a machine operator, he would typically operate the ballast regulator at around 30 mph, over five miles per hour faster than the federal limit for freight trains.  (Wise Dep at 30: 1 – 30: 9).  Accordingly, it is clear that BNSF's operators are not trained to consider operation of a ballast regulator to be constricted by those federal speed standards applicable to trains.

**c.  *Plaintiff's Claims Regarding BNSF's Failure to Station Employees at the Crossing are Not Preempted***

In its brief, BNSF argues that the FRSA preempts all claims related to BNSF's failure to provide alternative warning signals or devices because 23 C.F.R. § 646.214(b)(3) and (4) specify the particular type of warning devices that must be installed at a railroad grade crossing when federal funds are used.  (Doc. 77 at 9-13).  While Plaintiff has not asserted a claim that BNSF had a duty to construct a different or more advanced warning system at the crossing at issue, Plaintiff has alleged that BNSF failed to act in compliance with its *own policy* of flagging grade crossings when hazardous conditions exist (i.e. reduced visibility of the intersecting roadway).  (Doc. 37 ¶¶ 13-16).  BNSF asserts that this flagging claim is also preempted by the FRSA "in the same way and based on the same statutes and regulations as plaintiff's claim related to alternate warnings and signalization." (Doc. 77 at 14).  For the reasons set forth below, BNSF's argument for preemption should be rejected.

### i.  Plaintiff's claims related to the use of flagmen fall within the scope of 49 U.S.C. § 20106(b)'s savings clause

First and foremost, BNSF's preemption argument regarding Plaintiff's claim that it failed to comply with its own policy of flagging ignores the consequences of the 2007 Clarification Amendment to the FRSA.  49 U.S.C. § 20106(b) (2007).  In that Amendment, Congress "[made] clear that when a party alleges a railway failed to comply with a federal standard of care established by regulation or with its own plan, rule, or standard created pursuant to a federal regulation, preemption will not apply."  *Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1215 (10th Cir. 2008).  *See also Lundeen v. Canadian Pacific R. Co.*, 532 F.3d 682, 690 (8th Cir. 2008) ("The purpose of the amendment is to give railroad accident victims the right to seek recovery in state courts when they allege railroads violate safety standards imposed by a

railroad's own rules, certain state laws, or federal regulations."). Plaintiff's flagmen claims in this case fail within the Amendment's savings provisions.

Plaintiff has alleged that BNSF was negligent by failing to comply with its own internal safety rules, specifically, BNSF Maintenance of Way Operating Rule 6.50.2.[2] In support of its motion for summary judgment, BNSF submitted an affidavit from Arthur Charrow, the Director of Engineering Planning with BNSF. (Doc. 82). In this affidavit, Mr. Charrow asserts that MWOR 6.50.2 does not qualify as a rule, plan or standard created pursuant to a federal regulation or federal mandate. *Id.* Applicable federal law and BNSF's own discovery responses in this action, however, belie Mr. Charrow's assertion.

The Rail Safety Enforcement and Review Act of 1992 directed the Secretary of Transportation to review and revise federal rules relating to railroad track safety. 49 U.S.C. § 20142. In January 2007, the Federal Railroad Administration ("FRA") and Department of Transportation issued final rules related to the creation of safety procedures for railroad employees working on or near railroad tracks.[3] 61 FR 65959-01. Pursuant to 49 C.F.R. § 214.303(a), railroads are required to "adopt and implement a program that will afford on-track safety to all roadway workers whose duties are performed on that railroad." *Id.* These rules are to be written and made available to all employees. 49 C.F.R. § 214.309. Furthermore, federal regulations require a railroad to develop rules related to the use of roadway maintenance machines, such as a ballast regulator:

---

[2] BNSF MWOR 6.50.2 states that "On-track equipment must approach all grade crossings prepared to stop and must yield the right of way to vehicular traffic. If necessary, flag the crossing to protect movement of on-track equipment."

[3] Although the Roadway Protection Rules were designed to prescribe minimum safety standards for roadway workers, 49 U.S.C. 20106(b)'s savings provisions do not require that the plan, rule, or standard created pursuant to federal regulation be specifically directed toward the protection of third-parties in order for the preemption exception to apply.

(a) Each employer shall include in its on-track safety program specific provisions for the safety of roadway workers who operate or work near roadway maintenance machines. Those provisions shall address:

(1) Training and qualification of operators of roadway maintenance machines.

(2) Establishment and issuance of safety procedures both for general application and for specific types of machines.

(3) Communication between machine operators and roadway workers assigned to work near or on roadway maintenance machines.

(4) Spacing between machines to prevent collisions.

(5) Space between machines and roadway workers to prevent personal injury.

(6) Maximum working and travel speeds for machines dependent upon weather, visibility, and stopping capabilities.

49 C.F.R. § 214.341.

In promulgating 49 C.F.R. § 214.341, the Federal Railroad Administration and

Department of Transportation also issued specific guidance regarding the significant distinction

between safety rules for trains and those for roadway maintenance machines:

Section 214.341 addresses specific issues concerning roadway maintenance machines that need to be included in individual railroad program submissions. **FRA decided to address the hazards associated with these machines separately from those associated with trains, as the nature of the hazard is different.**  Referencing the definition of this term is a good place to start to understand this section. **Roadway maintenance machines are devices, the characteristics or use of which are unique to the railroad environment.**  The term includes both on-track and off-track machines. A roadway maintenance machine need not have a position for the operator on the machine nor need it have an operator at all; it could operate automatically, or semi-automatically.

. . .

**Examples of devices covered by this section include, but are not limited to,** crawler and wheel tractors operated near railroad tracks, track motor cars, **ballast regulators**, self-propelled tampers, hand-carried tampers with remote power units, powered cranes of all types, highway-rail cars and trucks while on or near tracks, snow plows-self propelled and pushed by locomotives, spreader-ditcher

13

cars, locomotive cranes, electric welders, electric generators, air compressors--on-track and off-track.

Roadway maintenance machines have a wide variety of configurations and characteristics, and new types are being developed regularly. **Each type presents unique hazards and necessitates unique accident prevention measures. Despite the wide diversity of the subject matter, FRA attempted to provide some guidance for the establishment of on-track safety when using roadway maintenance machines.**

**FRA believes that it is most effective to promulgate a general requirement for on-track safety around roadway maintenance machines, and require that the <u>details be provided by railroad management</u>, conferring with their employees, and industry suppliers.** Several railroads have adopted comprehensive rules that accommodate present and future machine types, as well as their own operating requirements. FRA has seen the text of such rules, as well as witnessed their application and believes that they can set examples for other railroads. **The requirement for issuance of on-track safety procedures for various types of roadway maintenance machines may be met by <u>general procedures that apply to a group of various machines</u>, supplemented wherever necessary by any specific requirements associated with particular types or models of machines.**

61 FR 65959, 65972 (emphasis added).

In addition to the federal mandate regarding the creation of safety rules, 49 C.F.R. §

214.341(b) states that no worker shall operate a roadway maintenance machine without having

first been trained in accordance with the provisions of 49 C.F.R. § 214.355.  According to §

214.355, "[t]he training and qualification of roadway workers who operate roadway maintenance

machines shall include, as a minimum:"

(1) Procedures to prevent a person from being struck by the machine when the machine is in motion or operation.

(2) Procedures to prevent any part of the machine from being struck by a train or other equipment on another track.

(3) Procedures to provide for stopping the machine short of other machines or obstructions on the track.

(4) Methods to determine safe operating procedures for each machine that the operator is expected to operate.

14

(b) Initial and periodic qualification of a roadway worker to operate roadway maintenance machines shall be evidenced by demonstrated proficiency.

*Id*. Likewise, 49 C.F.R. § 214.343 requires that all roadway workers are trained in the on-track safety procedures and demonstrate the ability to fulfill the responsibilities for on-track safety that are required of an individual roadway worker performing that assignment. In furtherance of this objective, "[e]ach employer shall provide to all roadway workers in its employ initial or recurrent training once every calendar year on the on-track safety rules and procedures that they are required to follow." *Id*. Further, "[e]ach employer of roadway workers shall maintain written or electronic records of each roadway worker qualification in effect." *Id*

In commenting on the training component of § 214.341, the FRA has stated:

**Section 214.341 requires that each roadway worker be given on-track safety training <u>once every calendar year</u>.** Adequate training is integral to any safety program. Hazards exist along a railroad, not all of which are obvious through the application of common sense without experience or training. An employee who has not been trained to protect against those hazards presents a significant risk to both himself and others.

. . .

The term "demonstrated proficiency" is used in this and other sections relative to employee qualification in a broad sense to mean that the employee being qualified would show to the employer sufficient understanding of the subject that the employee can perform the duties for which qualification is conferred in a safe manner. **Proficiency may be demonstrated by successful completion of a <u>written or oral examination</u>, an interactive training program using a computer, a practical demonstration of understanding and ability, or an appropriate combination of these in accordance with the requirements of this subpart.**

61 FR 10528, 10539 (emphasis added).

On June 8, 2010, Plaintiff served BNSF with Plaintiff's Interrogatories and Requests for Production of Documents to Defendant (First Set). (Eden Aff. ¶ 9 Ex. H). In Interrogatory No. 14 and Request for Production No. 4, Plaintiff asked BNSF to identify and produce "**any and all**

15

**rules, regulations, policies, procedures** or prohibitions Defendant had in place from 2007-

present concerning the use of Ballast Regulators . . . ." *Id.* In its response, dated July 15, 2010,

BNSF identified and provided copies of the following internal rules and policies:

> BNSF Engineering Instructions Chapter 1 and 14, BNSF Maintenance of Way
> Operating Rules (revised May 3, 2007), BNSF Maintenance of Way Safety Rules
> (revised August 10, 2007), BNSF Employee Safety Rules (revised 23, 2007),
> BNSF Mechanical Safety Rules and Policies (April 15, 2007) and BNSF System
> Special Instructions (April 29, 2007).

(Eden Aff. ¶ 10 Ex. I).  Since this production, no further rules, regulations, policies, or

procedures have been identified by BNSF relating to use of ballast regulators.

During his deposition, BNSF Roadmaster Tom Neeser described the training process for

machine operators who operate on-track equipment such as a ballast regulator.  He stated that on

an annual basis, machine operators are required to recertify themselves by submitting to rules

classes and written testing in order to test their proficiency in the BNSF Maintenance of Way

Operating Rules.  (Neeser Dep. at 69:  3 – 69:  21, 72:  4 – 72: 13).  Mr. Neeser also confirmed

that as a machine operator, Dwight Wise was issued a copy of the BNSF Maintenance of Way

Operating Rules.  (Neeser Dep. at 83:  22 – 83:  24).

Notwithstanding BNSF's self-serving assertions to the contrary, the above facts establish

that MWOR 6.50.2 qualifies under the preemption exceptions provided by 49 U.S.C. § 20106(b).

Simply put, federal law requires BNSF to formulate internal rules and procedures for on-track

safety around roadway maintenance machines.  49 C.F.R. § 214.341.  These rules must include

provisions for training of employees, general safety procedures for using the machines, and rules

for communication between machine operators and roadway workers assigned to work near or

on roadway maintenance machines.  *Id.*  This requirement for issuance of on-track safety

16

procedures for various types of roadway maintenance machines may be met by general procedures that apply to a group of various machines.  61 FR 65959, 65972.

Plaintiff has formally requested BNSF to produce any and all rules, regulations, policies, procedures or prohibitions Defendant had in place from 2007-present concerning the use of ballast regulators.  (Eden Aff. ¶ 9 Ex. H).  The documents produced related to the safe use of on-track equipment include BNSF's Maintenance of Way Operating Rules.  Included in these Maintenance of Way Operating Rules are rules pertaining to safety in operating on-track equipment, *see* MWOR § 6; *see also* 49 CFR § 214.341(a)(2), signals and communication between employees, *see* MWOR 5.0 - 5.3; *see also* 49 CFR § 214.341(a)(3), spacing between machines, *see* MWOR 6.51; *see also* 49 CFR § 214.341(a)(4)-(5), and maximum authorized speeds for on-track equipment which are dependent upon conditions such as track conditions, load, sight distance and visibility, *see* MWOR 6.50.1; *see also* 49 CFR § 214.341(a)(6).  (Eden Aff. ¶ 11-12 Ex. J & K).  MWOR 6.50.2 specifically relates to safety while using on-track or roadway maintenance machines like a ballast regulator.  As acknowledged by BNSF operator Dwight Wise, this rule exists to prevent accidents.  (Wise Dep. at 87:  5 – 87:  9).

In addition to the Maintenance of Way Operating Rules – which are substantively consistent with the requirements of 49 C.F.R. § 214.341 – BNSF also requires its machine operators to receive on-track safety instruction once every calendar year, just as is required by 49 C.F.R. § 214.341 and 49 C.F.R. § 214.343.  (Neeser Dep. at 69:  3 – 69:  21, 72:  4 – 72: 13); *see* 61 FR 10528, 10539 ("Section 214.341 requires that each roadway worker be given on-track safety training once every calendar year.").  Furthermore, BNSF tests its operator's proficiency in the rules by having each machine operator successfully complete a written examination. (Neeser Dep. at 69:  3 – 69:  21, 72:  4 – 72: 13); *see* 61 FR 10528, 10539 ("Proficiency may be

demonstrated by successful completion of a written or oral examination . . .").  BNSF then maintains a written record of each worker's qualification.  *See* 49 C.F.R. § 214.343(d) ("Each employer of roadway workers shall maintain written or electronic records of each roadway worker qualification in effect.").

Although BNSF asserts to this Court that the BNSF Maintenance of Way Operating Rules are not rules which were created pursuant to any federal regulation, they have failed to produce any other rules which would satisfy the requirements of 49 C.F.R. § 214.341. Therefore, unless BNSF has willfully withheld alternative safety rules which would satisfy those regulatory requirements, MWOR 6.50.2 must be viewed as a federal standard of care established by a regulation or a plan, rule, or standard created by BNSF pursuant to a federal regulation. Indeed, a least one court has recognized BNSF's Maintenance of Way Operating Rules as on-track safety procedures required by federal regulations.  *See Woods v. Burlington Northern and Santa Fe Ry.*, 104 P.3d 1037, 1043-44 (Mont. 2004) (Warner, J., dissenting) (noting that "[e]ach railroad is responsible for setting forth on-track safety procedures that are consistent with the federal regulations, but are specific to their own operations" and BNSF's Maintenance of Way Operating Rules were such "on-track safety rules").  For that reason, 49 U.S.C. § 20106(b) precludes preemption of Plaintiff's flagging claims.

### ii. 23 C.F.R. § 646.214 does not "cover" the adequacy of safety warnings as to ballast regulators

Even assuming *arguendo* that MWOR 6.50.2 does not fall within the scope of the Clarification Amendment's exceptions, Plaintiff's claims related to the use of flagmen are still not subject to federal preemption.  Under the FRSA's preemption and savings provisions, the primary issue in evaluating preemption is whether the Secretary has promulgated regulations "covering" the subject matter of the asserted state common law claim.  49 U.S.C. § 20106(a)(2).

As mandated by the United States Supreme Court, in order to prevail on this issue, the party seeking preemption carries the burden to establish more than that the regulations merely "touch upon" or "relate to" the subject matter. *Easterwood,* 507 U.S. at 664, 113 S.Ct. at 1737. Rather, the concept of "covering" under 49 U.S.C. § 20106 is a more restrictive term which indicates that pre-emption will lie *only* if the federal regulations "substantially subsume the subject matter of the relevant state law." *Id.*

BNSF contends that Plaintiff's flagging claims are preempted by 23 C.F.R. § 646.214(b), which sets forth the application regulations for warning devices and signals at railroad crossings. Specifically, 23 C.F.R. § 646.214(b) provides that

> (3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
>
>> (A) Multiple main line railroad tracks.
>>
>> (B) Multiple tracks at or in the vicinity of the crossing **which may be occupied by a train or locomotive** so as to obscure the movement of **another train** approaching the crossing.
>>
>> (C) High Speed **train operation** combined with limited sight distance at either single or multiple track crossings.
>>
>> (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
>>
>> (E) Either a high volume of vehicular traffic, **high number of train movements**, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
>>
>> (F) A diagnostic team recommends them.
>
> (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

*Id.* (emphasis added).

At the crossing at issue, the only warning devices installed were crossbuck signs. BNSF argues that because these crossbuck signs were installed with federal funds and subject to FHWA approval, the crossbuck signs alone are adequate warnings as a matter of law and such warnings are "sufficient without the addition of flagmen posted at the crossing." (Doc. 77 at 14). To substantiate its claim that the issue of flagmen is "subsumed" by the regulations provided in § 646.214(b), BNSF also highlights the definitions applicable to that section relating to "Active Warning Devices," noting that "crossing watchmen" are included within that definition. 23 C.F.R. § 646.204. BNSF's assumption that these federal regulations "cover" the subject matter at issue in *this* case, however, is misplaced.

In reviewing the text and structure of 23 C.F.R. § 646.214(b), it is evident that the adequacy of warning devices installed pursuant to this regulation relate specifically to providing warning to the general public of the presence of a *train*. For example, automatic gates with flashing light signals is viewed as an adequate minimum warning for crossings which combine factors of "high speed *train* operation" and "limited sight distance." *Id.* These regulations, however, do not "cover" the subject matter of adequate safety measures for *railroad maintenance machines* such as a ballast regulator. As discussed in its promulgation of safety regulations for roadway maintenance machines, the "FRA decided to address the hazards associated with these machines *separately from those associated with trains*, as the nature of the hazard is different." 61 FR 65959, 65972 (emphasis added). "Each type presents unique hazards and necessitates unique accident prevention measures." *Id.*

20

The distinction between trains and roadway maintenance machines is also clearly evidenced by the Secretary's definitions of active and passive warning devices.  Under 23 CFR § 646.204,

> Active Warning Devices means those traffic control devices **activated by the approach or presence of a train**, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, **all of which display to motorists positive warning of the approach or presence of a train.**
>
> . . .
>
> Passive Warning Devices means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings **to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train.**

23 C.F.R. § 646.204 (emphasis added).

According to the definitions prescribed by the Secretary, those types of warnings which may be installed pursuant to 23 C.F.R. § 646.214(b) – including "crossing watchmen" – relate specifically to providing positive warning of the approach or presence of a ***train***.  Active warning devices in particular are defined as traffic control devices "activated by the approach or presence of a train."  23 C.F.R. § 646.204.  A ballast regulator, however, is not a train.  More significantly, unlike a train, the presence of a ballast regulator will ***not*** activate any active warning device installed for the purpose of warning the general public.

> Q (by Mr. Evans):  … Do you know if the ballast regulator that was in involved in the accident in this case is heavy enough or will set off a signal?
>
> A (by BNSF Roadmaster Tom Neeser):  No.
>
> Q:  It will not?
>
> **A:  No.  It's set up so it won't.**
>
> Q:  So when they go through a crossing protected by lights, the lights will not operate?

21

A:  No.  They're not --

Q:  I asked a double negative.

**A:  No.  They're not supposed to.**

(Neeser Dep. at 54:  5 – 54:  20) (emphasis added).  Therefore, even if the grade crossing at issue had been equipped with lights and automatic gates, use of the Ballast Regulator at the crossing would not have triggered such warnings.   As a result, the definition of "Active Warning Device," which is the basis for BNSF's assertion that the issue of flagmen is preempted, does not even apply to ballast regulators.

Federal regulations which mandate warning devices that will operate to warn the public of the presence of a train, but which will *not* operate to warn the public of the presence of a ballast regulator, cannot logically be said to "cover" the adequacy of warning devices as to *both* machines.  *See Elrod v. Burlington No. R.R. Co.,* 68 F.3d 241, 244 (8th Cir. 1995) ("a railroad's common-law duty of care continues until the federally prescribed devices are actually installed and operating").  As such, it is clear that the regulations set forth in 23 C.F.R. § 646.214(b) do not contemplate the proper method of warning regarding the approach of a ballast regulator. Rather, the "FRA decided to address the hazards associated with [roadway maintenance machines] ***separately*** from those associated with trains, as the nature of the hazard is different." 61 FR 65959, 65972 (emphasis added).  It did so by "promulgat[ing] a general requirement for on-track safety around roadway maintenance machines, and require[ing] that the details be provided by railroad management, conferring with their employees, and industry suppliers."  *Id.*

The above interpretation in no way frustrates federal law, and remains true to the recognition that roadway maintenance machines "present[] unique hazards and necessitate[]

unique accident prevention measures." *Id.* As noted by both of Plaintiff's experts in this case, the design and function of a train, and the general public's ability to detect and perceive a train, are substantially different from that of a machine like a ballast regulator. (Eden Aff. ¶¶ 3, 7 Ex. B, F). The size, speed, braking capabilities and required qualifications to operate a train are all vastly different than that of a ballast regulator. Accordingly, what may constitute an adequate warning measure to indicate the approach of a 16 foot tall freight train does not automatically provide fair and adequate warning to the presence of a machine that is 400 percent smaller in size and equipped with numerous design aspects which pose a unique hazard to the general public.

The definitions of both active and passive warnings under the federal regulations make clear that such devices are designed to alert the public to the presence of a *train*, not a dangerous piece of maintenance equipment that the majority of drivers would not be familiar with. To adopt BNSF's position that 23 C.F.R. § 646.214(b) preempts any and all claims regarding the use of flagging, regardless of the type, size, or construction of the machine at issue, would ignore the FRA's own evaluation of the unique hazards presented by a ballast regulator. For these reasons, the provisions set forth in 23 C.F.R. § 646.214(b) cannot be said to "substantially subsume" the issue of adequate warnings to the approach of a ballast regulator and Plaintiff's claim related to the use of flagmen should not be preempted on that basis.

### iii. Genuine issues of fact exist as to whether BNSF Maintenance of Way Operating Rule 6.50.2 required BNSF to flag the crossing

In addition to preemption, BNSF's also argues that MWOR 6.50.2 "[a]s understood and applied by BNSF employees," does not require flagmen to be posted at rural crossings where corn interferes with the ballast operator's visibility. This argument, however, does not present an appropriate basis for summary judgment.

23

First and foremost, the plain and unambiguous language of MWOR 6.50.2 speaks for itself:

> On-track equipment must approach **all grade crossings** prepared to stop and must yield the right of way to vehicular traffic.  **If necessary, flag the crossing to protect movement of on-track equipment.**

(Eden Aff. ¶ 8 Ex. G) (emphasis added).  When asked about this second portion of MWOR 6.50.2 regarding flagging, Dwight Wise admitted in his deposition that visibility of the road is a basis for flagging a grade crossing under BNSF's policy.

> Q (by Mr. Eden):  What does "if necessary" mean? When would it be necessary to do that?
>
> A (by Mr. Wise):  I would say if you couldn't see, but --

(Wise Dep. at 95:  8 – 95:  10).

Second, on the day following the accident, August 22, 2007, BNSF Roadmaster Tom Neeser and machine operator Dwight Wise returned to the accident scene.  While there, Neeser and Wise began operating the ballast regulator along the track and Neeser instructed Wise "to do exactly what he did the day before."  (Neeser Dep. at 29:  7 – 29:  14).  Wise then operated the ballast regulator down the track toward the same grade crossing to demonstrate what he had done the day before.  *Id.*  While Wise was operating the machine, BNSF placed employees in orange vests at the entrance of the crossing in order to warn the public of the ballast regulator's presence.

> Q (by Mr. Evans):  Okay.  So using that terminology, on the next day, on August 22nd or August 23rd of 2007 when Mr. Wise was trying to exactly what he did the day of the accident, you had Burlington Northern people stationed at that crossing to make sure that it was safe, correct?
> . . .
>
> A (by BNSF Roadmaster Tom Neeser):  It was – yes.

(Neeser Dep. at 38:  23 – 39:  5).

24

Finally, evidence will also be presented at trial that in the days following the accident, BNSF Foreman Randy Miller made a statement to Thomas Skrovig's sister-in-law, Charlene Alverson, that he had been stopped at the grade crossing immediately preceding the accident crossing waiting for another roadway maintenance machine to pass.  (Alverson Dep. at 9: 13 – 9: 23, 21: 5 – 21: 12).  Because the second machine was moving slowly, however, Miller was unable to reach the accident crossing in time to protect it.  *Id.*

In view of the above, there exists a genuine issue of material fact as to whether BNSF violated its own policy, and summary judgment is not appropriate simply because BNSF now asserts that MWOR 6.50.2's flagging requirements did not apply to the crossing in question.

### iv.  South Dakota public policy does not restrict the jury's consideration of BNSF's violation of its own internal safety rules

Finally, BNSF's takes the position that it is entitled to summary judgment on Plaintiff's flagmen claim because "it is against the public policy of the State of South Dakota to use a company's internal rule to create a duty on the part of the company."  (Doc. 77 at 18) (citing *McGuire v. Curry*, 766 N.W.2d 501 (S.D. 2009)).  BNSF's argument, however, overextends the Court's actual holding in *McGuire* and its holdings in previous decisions.  In *McGuire,* the Court "decline[d] to hold that an employer affirmatively undertakes a general duty to the public based on the *sole* fact that the employer adopted a no-drinking policy."  *Id.* at 506-07 (emphasis added).  The Court did not, however, declare that a jury's consideration of a company's internal policies is *per se* inappropriate under South Dakota public policy.  Rather, the Court was merely adhering to the previous decisions in which it has held that, while internal policies do not alone conclusively establish a duty/standard of care, the failure to follow such rules and regulations may be evidence of negligence.  *See Wuest ex rel. Carver v. McKennan Hosp.,* 619 N.W.2d 682,

25

688-89 (S.D. 2000) (holding that a jury instruction advising the jury to consider a hospital's internals policies when determining standard of care "correctly stated the law").

It is a question for the jury to determine whether or not, taking all relevance evidence into consideration, a flagman should have been protecting the crossing at issue. Consideration of MWOR 6.50.2 should be part of that evaluation.

### d. *Plaintiff's Claims Relating to Vegetation are Not Preempted*

BNSF also argues that the FRSA preempts all common law claims related to vegetation. (Doc. 77 at 19-22). This argument, however, is both confusing and misplaced. Initially, it must be noted that Plaintiff has not made the claim that BNSF was negligent because it failed to clear vegetation located on its property. Rather, Plaintiff is alleging that the operator of the ballast regulator breached his duty of care by failing to yield to vehicular traffic and make a proper lookout before entering the grade crossing. The operator's lack of visibility regarding vehicular traffic on the intersecting road due to the presence of a nearby corn field is a fact relevant to this claim. Plaintiff's claims related to visibility, however, are in no way subsumed by the federal regulation related to vegetation control.

The federal regulation cited by BNSF, 49 C.F.R. § 213.37, provides that

Vegetation **on railroad property which is on or immediately adjacent to roadbed** shall be controlled so that it does not--

(a) Become a fire hazard to track-carrying structures;

(b) Obstruct visibility of railroad signs and signals:

(1) Along the right-of-way, and

(2) At highway-rail crossings; (This paragraph (b)(2) is applicable September 21, 1999.)

(c) Interfere with railroad employees performing normal trackside duties;

26

(d) Prevent proper functioning of signal and communication lines; or

(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

*Id.* The plain language of this regulation specifically limits its application to vegetation "***on railroad property*** which is ***on or immediately*** adjacent to roadbed." 49 CFR § 213.37 (emphasis added). In view of this specific limitation, numerous federal courts have held that claims for vegetation *beyond* that area are not preempted. *See Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1554 (11th Cir. 1991) ("[W]hile the Secretary has chosen to regulate the vegetation on and immediately adjacent to the railbed, the Secretary has not regulated vegetation which is not immediately adjacent to the railbed."); *Missouri Pacific R. Co. v. Railroad Commission of Texas*, 833 F.2d 570, 577 (5th Cir. 1987) (holding that because federal regulations apply only to vegetation on, and immediately adjacent to, the railbed, states are free to regulate vegetation located beyond the area contemplated by 49 C.F.R. § 213.37).

In this case, the corn field at issue was located in the northeast quadrant of the grade crossing area, on land owned by a farmer, Kenny Mader. (Tami Skrovig Dep. at 69: 2 – 70: 1). As demonstrated by photographs of the scene taken by BNSF, the corn was not growing "on railroad property" nor was it "*immediately* adjacent to the roadbed." (Eden Aff. ¶ 13 Ex. L). Accordingly, the limited scope of 49 C.F.R. § 213.37 does not "cover" any claims pertaining to the corn field at issue.

In support of its claim for preemption, BNSF's cites to the decision in *O'Bannon v. Union Pacific R. Co.,* 960 F.Supp. 1411 (W.D. Mo. 1997). In *O'Bannon*, the plaintiffs alleged that due to vegetation growing in the the railroad track right-of-way, visibility of the oncoming train operated by defendant was impaired, and the train was moving so quickly that, by the time it emerged from the cluster of brush, trees, and shrubbery, it was too late to avoid the collision.

*Id.* at 1422.  In analyzing this claim, the Court found that such allegations "demonstrate that the vegetation claim combines issues of both excessive speed and negligent control of vegetation." *Id.*  As to the issue of control of vegetation, the Court noted that 49 C.F.R. § 213.37 "requires railroads to control vegetation on railroad property which is on or immediately adjacent to the roadbed so that it does not obstruct visibility of railroad signs and signals." *Id.*  The court further noted that

> The Secretary did not impose a broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains. **Instead, the regulations governing maximum operational speed account for such conditions and safety hazards.**  See 49 C.F.R. § 213.9(a) (prescribing maximum operational speeds for freight and passenger trains).

*Id.* at 1422-23 (emphasis added).  As a result of this finding, the plaintiffs' claims in *O'Bannon* regarding vegetation were preempted.[4]

Unlike in *O'Bannon,* Plaintiff in this case is not making any claims related to vegetation located on or immediately adjacent to the tracks.  *See Missouri Pacific R. Co.,* 833 F.2d 570. More significantly, because Plaintiff's claim in this case is based on the issue of visibility, BNSF's proposed application of *O'Bannon* is inappropriate.  In *O'Bannon,* the court held that "the duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains" was subsumed by federal regulations governing maximum operational *speed* of a train, 49 C.F.R. § 213.9(a).  *O'Bannon,* 960 F.Supp. at 1422-23.  As discussed above, however, these speed regulations do not apply to roadway maintenance machines like a ballast regulator.  As such, federal regulations cannot be said to "cover" the same subject matter as it is undisputed that such regulations do not address the speed of the machine at issue.

---

[4]  Although not argued in BNSF's brief, it should be noted that Plaintiff's claims related to reduced visibility are also not subject to preemption by the regulations set forth in 49 C.F.R. § 646.214(b)(3) and (4) concerning appropriate warning devices.  *See Murrell v. Union Pacific R. Co.,* 544 F.Supp.2d 1138, 1156 (D. Or. 2008) (quoting *Strozyk v. Norfolk S. Corp.*, 358 F.3d 268, 277 (3d Cir. 2004)).

28

In addition to misapplying *O'Bannon,* BNSF also misstates the holding of the court in *Van Buren v. Burlington Northern Santa Fe Ry. Co.,* 544 F.Supp.2d 867 (D. Neb. 2008).  In *Van Buren,* the court had previously set forth an order limiting the specification of negligence regarding vegetation to whether BNSF was negligent by "allowing a farmer to grow corn on land adjacent to the crossing in such away [sic] as to partially or fully obstruct the line of sight of the plaintiff regarding his ability to observe the train as he approached the crossing." *Id.* at 878.  In that case, the plaintiff had initially claimed that corn adjacent to the tracks had blocked his view of the defendant's train. *Id.* He later altered this position, however, by arguing that his "claims regarding vegetation and obstruction of view are not limited to the crossing and the area immediately adjacent to the railroad tracks," but rather the "claims that the Defendant was negligent focuse[d] on the property owned and controlled by the Defendant in the southeast quadrant of the crossing in question." *Id.* Because this claim was outside the specifications of negligence permitted by the court's prior order, it was rejected by the court. *Id.* ("The claim that Defendant was negligent for permitting corn in the right of way but not adjacent to the tracks to obstruct the view of trains approaching the crossing from the south claim fails *because it is outside the specifications of negligence permitted by my prior order*.") (emphasis added).

In its brief, BNSF erroneously argues that despite finding that the corn was on BNSF's right of way but not immediately adjacent to the tracks, the court found that even if the claim had not failed for being outside the scope of the court's previous order, it "would have been preempted because federal regulations govern vegetation on or immediately adjacent to the railbed." *Id*. n.14." (Doc. 77).  As is clear from the opinion, however, the footnote added by the court in *Van Buren* referred *only* to the initial claim made by the plaintiff that corn adjacent to the tracks and crossing had blocked his view. *Id.* Accordingly, BNSF's attempt to cite *Van*

*Buren* as authority for the position that claims related to vegetation *not* immediately adjacent to the railbed can be preempted is misleading.

Simply put, Plaintiff is not making the claim that BNSF had a duty to clear the corn field at issue.  Rather, Plaintiff is alleging that the operator of the ballast regulator breached his duty of care.  The fact that the operator's view was severely obstructed due to the corn field at the northeast quadrant of the crossing only serves to heighten this duty.  *See* (Doc. 37 ¶ 13).  For these reasons, BNSF's preemption arguments relating to vegetation must fail.

### III.   Whether Thomas Skrovig was Contributorily Negligent and Whether Such Negligence was "Slight" in Comparison to the Negligence of BNSF are Questions for the Jury

In addition to its arguments in favor of federal preemption, BNSF asserts that Plaintiff's recovery is completely barred by the contributory negligence of the deceased, Thomas Skrovig. (Doc. 77 at 22-31).  In arguing this point, BNSF seeks to take the genuine issues of material fact as to Thomas Skrovig's alleged negligence and the issue of BNSF's comparative fault out of the hands of the jury and have them determined by this Court as a matter of law.  Issues of negligence, contributory negligence, and proximate cause, however, are "ordinarily questions of fact, and it must be a clear case before a trial judge is justified in taking these issues from a jury." *Baddou v. Hall*, 756 N.W.2d 554, 562 (S.D. 2008).  "It is only when reasonable people can draw but one conclusion from facts and inferences that they become a matter of law and this rarely occurs." *Id.*  Here, because issues of material fact exist as to Thomas Skrovig's alleged contributory negligence and whether such alleged negligence was more than slight when compared with the negligence of BNSF, BNSF's request for summary judgment should be denied. *See Schultz v. Heritage Mut. Ins. Co.*, 902 F.Supp. 1051, 1058 (D.S.D. 1995) (quoting *Peters v. Hoisington*, 37 N.W.2d 410, 413 (1949) ("Contributory negligence is a question of law

only when the court is impelled to say that from the facts reasonable men can draw but one conclusion pointing unerringly to the negligence of the plaintiff contributing to his injury.").

BNSF contends that Thomas Skrovig "engaged in both ordinary negligence and negligence per se when he violated a safety statute without a legal excuse."  The statute at issue, SDCL § 32-25-13, provides that

> When approaching within fifty feet of a grade crossing of any railway when the driver's view is obstructed, the maximum speed shall be fifteen miles per hour. A driver's view is obstructed if at any time during the last two hundred feet of his approach to such crossing he does not have a clear and uninterrupted view of any traffic on such railway for a distance of four hundred feet in each direction. A violation of this section is a Class 2 misdemeanor.

*Id.*  Thomas Skrovig's alleged violation of SDCL § 32-25-13, however, is not an undisputed fact. As set forth in the report of Plaintiff's expert David Noyce, Thomas Skrovig's vehicle damage provides information pertaining to the relative speed between the Skrovig vehicle and the ballast regulator at impact.  (Eden Aff. ¶ 3 Ex. B).  According to Dr. Noyce, the damage to the Toyota Tundra caused by the front nose of the Ballast Regulator transitions at an approximately 3:1 ratio, indicating a vehicle speed differential of the same ratio.  *Id.*  As such, if, as testified to by operator Dwight Wise, the ballast regulator was traveling at 5 mph, the estimated speed of Thomas Skrovig's vehicle at the time of impact would be approximately 15 mph.  *Id.* Furthermore, Sergeant Jeff Gromer, the law enforcement officer in charge of investigating the Skrovig accident, testified in his deposition that he did not believe the Skrovig vehicle was traveling very fast (i.e. more than 10-20 mph) at the time of impact.  (Gromer Dep. at 42:  3 – 42: 21).

While other evidence calls into question the accuracy of Dwight Wise's testimony regarding his speed as he entered the grade crossing, a jury could conclude that Wise's testimony that he was going 5 mph is credible.  That same jury may conclude that the opinions of Dr.

Noyce and/or Sergeant Gromer are also credible, thereby determining that Thomas Skrovig was not traveling at a speed in excess of SDCL § 32-25-13's statutory limit.  All of these questions relating to speed and witness credibility, however, are questions that are properly left to the jury, and are not appropriately determined as a matter of law.  Furthermore, while BNSF cites to the opinion of its own expert witness for the proposition that "if Thomas Skrovig's Toyota had been traveling at 15 miles per hour or less while it was approaching within fifty feet of the railroad crossing where the accident in this case occurred, the collision between it and the ballast regulator would not have occurred," the testimony of BNSF's own retained expert is not an undisputed fact upon which summary judgment can be granted.

Even *assuming* for purposes of summary judgment that Thomas Skrovig was traveling in excess of 15 mph, this fact alone does automatically bar Plaintiff's recovery.  To the contrary, it is well-established under South Dakota law that a contributorily negligent plaintiff may still recover damages if that negligence was slight in comparison with the negligence of the defendant.  SDCL § 20-9-2.  The comparison is made with the negligence of the defendant rather than with the ordinarily prudent person.  *Estate of He Crow v. Jensen*, 494 N.W.2d 186, 188 (S.D. 1992).  A plaintiff's contributory negligence is slight when it is "small in quantum in comparison with the negligence of the defendant."  *Id.*  Further, the issue of whether a plaintiff's negligence is slight compared to that of the defendant "is a *question of fact* which varies with the facts and circumstances of each case."  *Id.* (emphasis added).

Although BNSF argues that Thomas Skrovig was negligent *per se* for violating a safety statute, negligence as a matter of law is not a special class of "worse than usual" negligence.  Proving the violation of a statute simply proves that a party was negligent; it does not establish that the party's negligence was more than slight.  As such, the South Dakota Supreme Court has

32

made clear that jury determination is proper even when the plaintiff is in violation of a statute. *See Crabb v. Wade*, 167 N.W.2d 546, 549-550 (S.D. 1969) (holding that where the decedent was walking on the wrong side of the road in violation of a statutory rule of safety and struck by the defendant's car, "the issues of proximate cause and the comparative extent of decedent's contributory negligence were properly submitted to and determined by the jury"); *Roberts v. Brown*, 36 N.W.2d 665, 668 (S.D. 1949) (holding that it was "within the province of the jury" to find for the plaintiff, despite the fact that the plaintiff had violated a traffic statute and the violation was a contributing cause of the collision). *See also Snodgrass v. Nelson*, 369 F.Supp. 1206, 1210-12 (D. S.D. 1974) (applying South Dakota law) (holding that although plaintiff and the plaintiff's decedent were in violation of a number of statutes at the time of the accident, the plaintiff could recover, as her and the decedent's negligence was slight when compared to that of the defendant, who knew the poor condition of the road and would have had a lengthy distance to gain control of his vehicle and avoid the collision had he not been speeding).

In this case, Plaintiff has retained two engineering experts with expertise in the areas of accident reconstruction and human factors, David Noyce, Ph.D. and Mark Lee Edwards, Ph.D., to evaluate the accident at issue. (Eden Aff. ¶ 3, 7 Ex. B & F). Both experts have rendered the conclusion that BNSF machine operator Dwight Wise was negligent and that this negligence was the proximate cause of the accident. According to Dr. Noyce, "Mr. Skrovig had no time to perceive and react to the approaching railroad vehicle given the substandard sight distance available at this location." (Eden Aff. ¶ 3 Ex. B, Noyce Report at 8). Furthermore, Dr. Noyce opines that "Mr. Wise had the first opportunity to observe the approaching Skrovig vehicle as it approached the highway-railroad grade crossing," and had "Mr. Wise had appropriate lookout as he approached the roadway crossing, and followed company policy by yielding the right of way

to Mr. Skrovig," the accident would not have happened.  (Eden Aff. ¶ 3 Ex. B, Noyce Report at 9).

Similarly, Dr. Edwards has offered the opinion that "the decision of the Ballast Regulator operator to enter the crossing without stopping denied him the opportunity to observe and respond to the approach of Mr. Skrovig without intruding into the roadway" and "the unexpected nature of the entry of the Ballast Regulator into the roadway under the restricted sight conditions present at the time did not provide Mr. Skrovig with sufficient time to successfully avoid colliding with it."  (Eden Aff. ¶ 7 Ex. F, Edwards Report at 3).  These two expert opinions clearly create a genuine issue of material facts as to whether Thomas Skrovig "breached his common law duty to look and listen when he reached a point where he had an unobstructed view of the track." (Doc. 77 at 31).  Accordingly, the evidence of BNSF's negligence should be presented along with all other relevant evidence to the jury and the jury should be allowed to determine whether Thomas Skrovig was negligent and whether such negligence was more than slight when compared with that of BNSF.

Moreover, there exists a question of fact as to the whether BNSF operator Dwight Wise saw Thomas Skrovig's vehicle before the accident and had the last clear chance to avoid the collision.  Under South Dakota law, the continuing negligence of a plaintiff is neutralized by the "last clear chance" doctrine where "the evidence will support an inference that the defendant actually discovered the peril" to the plaintiff and "thereafter failed to act with reasonable care." *Good Low v. U.S.*, 428 F.3d 1126, 1130 (8th Cir. 2005) (applying South Dakota law) (quoting *Haase v. Willers Truck Service, Inc.*, 34 N.W.2d 313, 317 (1948)).  Here, Wise admitted during his deposition that he did see Thomas Skrovig's vehicle before he entered the crossing.

Q (by Mr. Eden):  It's your testimony that you saw Mr. Skrovig's vehicle before you entered the crossing?

34

A (by Mr. Wise):  I'm going to say so, yeah.

(Wise Dep. at 105:  11 – 105:  18).  This testimony, coupled with the opinions of Plaintiff's

expert David Noyce that "Mr. Wise had the first opportunity to observe the approaching Skrovig

vehicle as it approached the highway-railroad grade crossing," lend strong support for

application of the "last clear chance" doctrine in this case.

At most, evidence that a plaintiff may have been negligent *per se* entitles a defendant to a

contributory negligence instruction, not summary judgment.  *Gaillard v. Jim's Water Service,*

*Inc*., 535 F.3d 771, 775 (8th Cir. 2008) (applying South Dakota law).  The cases cited in BNSF's

brief in opposition to this principle are not persuasive in this regard.  For example, *Wooley v.*

*Chicago & N. W. Ry. Co.*, 50 N.W.2d 644 (S.D. 1951), is plainly distinguishable from this case.

In *Wooley,* it was undisputed that the decedent driver had an unobstructed view of the

track to the west for a distance of a mile or more until she reached a point 75 feet south of the

crossing.  *Id.* at 645.  At that point, a depot then obstructed her view to the west.  *Id.*  However,

the evidence further showed that "from a point 50 feet south of the track there is an unobstructed

view in the direction from which the train was coming of 297 feet and from that point to the

crossing the range of vision increases."  *Id* at 646.  As such, the court concluded that "[i]t is

apparent that the depot could not have concealed the movement of the train consisting of a Diesel

locomotive and 29 cars having a total length of slightly more than a quarter of a mile."  *Id.*  Thus,

"[i]f decedent exercised due care for her own safety, she looked and listened when she reached a

point where she had an unobstructed view of the track. If she looked, she saw the train

approaching."  *Id.* at 647.

In the instant case, it is undisputed that the corn field in the northeast quadrant of the

grade crossing area presented a severe visual obstruction to Thomas Skrovig.  Therefore, unlike

the plaintiff in *Wooley,* Thomas Skrovig did not have the opportunity to detect and appreciate the presence of the ballast regulator traveling toward him. (Eden Aff. ¶ 3, 7 Ex. B & F). Furthermore, unlike the train in *Wooley,* the ballast regulator operated by Mr. Wise had the capability of braking before the crossing and allowing the Skrovig vehicle to have the right-of-way. Accordingly, the findings in *Wooley* should have no bearing on the Court's holding in this case.

Curiously, BNSF also cites to the decision in *Wood v. City of Crooks,* 559 N.W.2d 558 (S.D. 1997) as authority for its position. The South Dakota Supreme Court made clear in *Wood* that "the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant[.]" *Id.* at 560. Furthermore, the Court found that in that case that "[w]hether Wood was contributorily negligent was a question of fact properly submitted to the jury." *Id.* (citing *Theunissen v. Brisky*, 438 N.W.2d 221, 223-24 (S.D. 1989) (reversing trial court's grant of summary judgment because it was based on a finding of contributory negligence as a matter of law)).

Only "[w]here the evidence establishes that the plaintiff was beyond reasonable dispute guilty of negligence more that slight [is it] the duty of the court to direct a verdict for the defendant." *Theunissen v. Brisky*, 438 N.W.2d 221, 223 (S.D. 1989). In this case, questions of fact exist as to the alleged contributory negligence of Thomas Skrovig, whether Skrovig had an opportunity to detect and appreciate the ballast regulator sufficient to avoid the collision, whether the alleged negligence of Thomas Skrovig was less than slight in comparison with the negligence of BNSF operator Dwight Wise, and whether Wise had the "last clear chance" to avoid the

36

accident, thereby neutralizing any claim of contributory negligence.  For these reasons, judgment as a matter of law is inappropriate and BNSF's motion for summary judgment should be denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff Tami Skrovig, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, requests that Defendant's Motion for Summary Judgment be denied in its entirety.

Dated at Sioux Falls, South Dakota, this 3rd day of August, 2011.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

_/s/ Shane E. Eden_____
Edwin Evans
Mark W. Haigh
Shane E. Eden
206 West 14th Street
PO Box 1030
Sioux Falls, SD 57101-1030
Telephone:  (605) 336-2880
Facsimile:  (605) 335-3639
*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE WITH D.S.D. Civ. LR 7.1.B.1**

The undersigned hereby certifies that this brief complies with the type-volume limitation of D.S.D. Civ. LR 7.1.B.1 because this brief contains 11,981 words, according to the word-processing system used to prepare this brief.

*/s/ Shane E. Eden*_____
Shane E. Eden

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, one of the attorneys for Tami Skrovig, as Personal Representative of

the Estate of Thomas Jeffrey Skrovig, deceased, hereby certifies on this 3rd day of August, 2011,

I caused the following document:

♦   **Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment**

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-mail

notice of the electronic filing to the following:

> Thomas C. Sattler
> WOLFE, SNOWDEN, HURD, LUERS & AHL, LLP
> Wells Fargo Center
> 1248 "O" Street, Suite 800
> Lincoln, NE 68508-1424
> *Attorneys for Defendant*

*/s/ Shane E. Eden*_____
Shane E. Eden
