UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| TAMI SKROVIG, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, deceased, | ) ) ) | CIV. 10-4022 |
| | ) | |
| Plaintiff, | ) | ORDER |
| | ) | |
| vs. | ) | |
| | ) | |
| BNSF RAILWAY COMPANY, a Delaware corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Plaintiff Tami Skrovig ("plaintiff" or "Mrs. Skrovig") filed an amended complaint asserting various claims of negligence against defendant BNSF Railway Company ("BNSF") arising from a pickup and railroad maintenance machine collision in which her husband, Thomas Skrovig ("Mr. Skrovig"), died. (Docket 37). Defendant's answer denies plaintiff is entitled to recovery, asserting BNSF was not negligent; some, if not all, of plaintiff's negligence claims are preempted by federal law; and if BNSF was negligent, Mr. Skrovig was negligent as a matter of law and his contributory negligence was greater than slight thereby barring recovery. (Docket 38). Defendant filed a motion for summary judgment. (Docket 76). Defendant also filed a motion to strike and objection to the affidavits of plaintiff's expert witnesses. (Docket 95). Briefing on the motions is complete and the matters are ripe

for resolution by the court.  For the reasons stated below, defendant's motion to strike, objection to affidavits, and defendant's motion for summary judgment are denied.

## STANDARD OF REVIEW

A party is entitled to summary judgment if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Id. at 248.  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to

"make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011) (citing Anderson, 477 U.S. at 252).

## DEFENDANT'S MOTION TO STRIKE AFFIDAVITS

In response to defendant's motion for summary judgment, plaintiff submitted two expert witness reports.  (Dockets 86-2 & 86-6).  Plaintiff asserts these reports create genuine issues of material fact which defeat

defendant's entitlement to summary judgment as a matter of law.  BNSF's

reply memorandum objected to the submission of these documents as

unsworn hearsay in violation of Fed. R. Evid. 801(c) and 802.  (Docket 91 at

pp. 25-26).  Plaintiff then submitted sworn affidavits from the two

witnesses, with the original reports attached.  (Dockets 93, 93-2, 94 & 94-

2).

     This scenario is exactly the same situation which occurred in DG & G,

Inc. v. Flexsol Packaging Corporation of Pompano Beach, 576 F.3d 820 (8th

Cir. 2009).  "FlexSol introduced unverified documents into the record.

DG&G objected.  FlexSol later provided [the witness'] affidavit verifying his

reports, and the district court found that the documents were 'cured' for

summary judgment."  Id. at 825.  "To be considered on summary judgment,

documents must be authenticated by and attached to an affidavit made on

personal knowledge setting forth such facts as would be admissible in

evidence or a deposition that meets the requirements of Fed. R. Civ. P.

56(e)."  Id. at 825-26 (citing  Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th

Cir. 2005) (internal quotations omitted)).  "The district court has discretion

whether to accept or reject such untimely filed materials."  Id. at 826

(internal citations omitted).  "[S]ubsequent verification or reaffirmation of an

unsworn expert's report, either by affidavit or deposition, allows the court to

consider the . . . unsworn expert's report on a motion for summary

4

judgment." Id.  "[T]he district court did not abuse its discretion in considering the cured documents." Id. at 826.

BNSF does not dispute the witnesses' reports were served on it on May 27, 2011.  BNSF specifically addressed the contents of these reports in its reply brief.  (Docket 91 at pp. 25-26).  The court finds no prejudice to BNSF by the consideration of the reports and the affidavits of the witnesses, Mr. Noyce and Mr. Edwards.  (Dockets 93, 93-2, 94 & 94-2).  BNSF objects to the expert reports as containing or relying upon hearsay.  Federal Rule of Evidence 703 permits an expert to form opinions based upon information which itself is inadmissible but which is of a type reasonably relied upon in the expert's field.  Defendant's motion to strike and objection to the affidavits (Docket 95) is denied.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The undisputed material facts are gathered from plaintiff's amended complaint (Docket 37), defendant's answers to the amended complaint[1] (Docket 38), defendant's statement of undisputed facts (Docket 77, pp. 2-4), and plaintiff's response to defendant's statement of undisputed material

---

[1]Where defendant's answer (Docket 38) admits an allegation of plaintiff's amended complaint (Docket 37), the reference will be to plaintiff's amended complaint.

facts.[2]  (Docket 85, p. 2).  Other citations to the record will be made where
appropriate.

On the bright, clear summer day August 21, 2007, at around 11 a.m.,
BNSF employee Dwight Wise operated a piece of railway maintenance
equipment, specifically a Kershaw Ballast Regulator ("ballast regulator"),[3] on
a railroad track in rural Minnehaha County, South Dakota.  (Docket 77, p.
2, ¶ 1).  Mr. Wise left Sioux Falls, South Dakota, with the ballast regulator
on the rails the morning of August 21, 2007, and was en route to
Wentworth, South Dakota, to work on a crossing.  Id.

As the ballast regulator neared the railroad track's intersection with
465th Avenue (the "465th Avenue Crossing" or "railroad crossing") heading
west, Mr. Wise "tooted his horn."  (Dockets 77, p. 2, ¶ 2 & 85, p. 2, ¶ 2).  At
this same time, Mr. Skrovig was driving his vehicle[4] south on 465th Avenue

---

[2]Where plaintiff's response  (Docket 85, p. 2) admits a statement of
material fact of the defendant (Docket 77, pp. 2-4), the reference will be to
defendant's statement of undisputed material facts.

[3]Wing blades on either side of a ballast regulator are used to smooth out
gravel placed in piles along the railroad tracks.  (Dockets 86-1 at p. 4 & 86-4 at
pp. 1-2).  According to BNSF documents, a ballast regulator has an overall
length of 35'1" and an overall height of 11'8" to the top of equipment located on
the roof of the cab.  (Docket 86-4, p. 2).  The front portion of a ballast regulator
has a protruding nose with smaller dimensions.  See Docket 86-3 (photograph).

[4]Mr. Skrovig's vehicle was a red Toyota Tundra pickup.  (Docket 85 at p.
3).

6

toward the 465th Avenue Crossing.  (Docket 77, p. 2, ¶ 3).  During the last
200 feet of Mr. Skrovig's approach to the railroad crossing, corn growing on
the northeast quadrant of the crossing[5] would have prevented him from
having a clear, uninterrupted view of the ballast regulator during the last
400 feet of the ballast regulator's approach to the 465th Avenue Crossing.
Id. at ¶ 4.  Mr. Skrovig's view was obstructed as he approached the railroad
crossing where his pickup collided with the ballast regulator.  Id. at ¶¶ 5 &
10.  The ballast regulator struck Mr. Skrovig's pickup on the driver's side
and pushed the vehicle approximately 50 feet in a westerly direction along
the railroad tracks.  (Docket 85, p. 3).  Mr. Skrovig died as a result of the
collision.  Id.

    Mr. Skrovig had driven over the 465th Avenue Crossing multiple
times.  In the eight weeks prior to his death, he drove over the railroad
crossing on average once per week because he was contracted to build a
house in the area.  (Docket 77 at p. 3, ¶ 6).  Mrs. Skrovig testified that Mr.
Skrovig's typical speed going over the railroad crossing, traveling north to
south, was probably 40-45 miles per hour.  Id. at ¶ 7.

    Mr. Wise, the only surviving eyewitness to the collision, testified Mr.
Skrovig was driving approximately 30 miles per hour as his vehicle

---

[5]Law enforcement investigating the incident reported "the corn was full
grown, probably seven foot tall or better . . . ."  (Docket 86-1, p. 3).

approached the 465th Avenue Crossing.  Id. at ¶ 8.  Mr. Wise initially

reported to a law enforcement officer the speed of the ballast regulator was

between 10-15 miles per hour at the time of collision.  (Docket 85, p. 2, ¶ 2).

In his deposition, Mr. Wise changed his speed estimate to 5 miles per hour.

Id.

      The 465th Avenue Crossing where the collision occurred was owned,

operated and maintained by BNSF.  (Docket 37, ¶ 9).  The ballast regulator

involved in the collision was owned, operated and maintained by BNSF.  Id.

at ¶ 10.  Mr. Wise, as the operator of the ballast regulator, was an employee

of BNSF acting within the course and scope of his employment at the time of

the collision.  Id. at ¶ 11.  The railroad crossing, which is identified as DOT

No. 097327S, was marked by crossbuck signs which were present and

operational at the time of the collision and were not obscured by any objects

or vegetation.  (Docket 77 at p. 3, ¶ 11).  The crossbuck sign facing

southbound motorists had reflective material on both the front and back of

the sign face (the part of the crossbuck that forms an "x" and marked with

the words "railroad crossing").[6]  Id.; see also Docket 79-1.  The crossbuck

signs for this crossing were installed as part of a statewide program initiated

---

[6]Not existing on the front side of the support for the crossbuck was a
strip of "retroreflective white material, not less than 50 mm (2 inches) in width"
for the full length of the support.  (Dockets 85 at p. 2, ¶ 11 & 79-1).  The court
does not consider this deficiency "material" as resolution of this issue would
not "affect[] the outcome of the case."  Mayer, 647 F.3d at 791.

and completed between 1988 and 1990 using federal funds.  (Docket 77 at p. 4, ¶ 12).

## DECISION

BNSF moves for summary judgment asserting federal preemption on plaintiff's claims of (1) failure to warn; (2) failure to post a flagman at the crossing; and (3) claims relating to vegetation at or immediately adjacent to the railroad roadbed.[7]  (Docket 91 at p. 4).  BNSF also moved for summary judgment asserting Mr. Skrovig's contributory negligence was greater than slight barring any recovery against defendant.  Id.

BNSF argues the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101 *et seq.*, under the supremacy clause of the United States Constitution, Article VI, cl. 2, preempts plaintiff's negligence claims. (Docket 77 at p. 6).  "The purpose of [FRSA] is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  Preemption is specifically addressed in the FRSA:

> (a) National uniformity of regulation.--(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.

---

[7]BNSF does not argue preemption bars plaintiff's claims related to horn-blowing, the speed of the ballast regulator, Mr. Wise's failure to slow down and stop the ballast regulator prior to entering the crossing, or his failure to keep and maintain a proper lookout and keep the ballast regulator under proper control to avoid the collision.

(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters)[8] . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.  A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--

> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (B) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.--(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--

> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters) . . . covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by . . . the Secretar[y]; or
>
> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2). . . .

---

[8]The FRSA also gives authority to the Secretary of Homeland Security to promulgate regulations related to railroad security matters.  49 U.S.C. § 20106(a)(2).  Railroad security matters are not relevant to this litigation and all references to the Secretary of Homeland Security are redacted.

49 U.S.C. § 20106.  "Where a state statute conflicts with, or frustrates, federal law, the former must give way. . . . applicable federal regulations may pre-empt any state law, rule, regulation, order, or standard relating to railroad safety.  Legal duties imposed on railroads by the common law fall within the scope of these broad phrases."  CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 663-64 (1993) (internal citation and quotation marks omitted).

    In Easterwood, decedent's widow sued CSX for negligence "under Georgia law for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed."  Id. at 661.  The issue before the court was "whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings."  Id. at 664.  "To prevail on the claim that the regulations have pre-emptive effect, [CSX] must establish more than that they 'touch upon' or 'relate to' that subject matter . . . 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."  Id. (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383-84 (1992) (statute's use of "relating to" confers broad pre-emptive effect).  "The term 'covering' is in turn employed within a provision that displays considerable

11

solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses." Id. at 665 (internal citation omitted).

Under regulations relating to grade crossing warning devices, the Easterwood court concluded "for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection.  The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which [Mrs. Easterwood] relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." Id. at 671.  However, in Easterwood, the pre-conditions to the application of the regulations had not been met.  Since the plan for installation of the device was deferred, federal funds were not used to actually construct the crossing warning device.  The Easterwood court concluded the "facts do not establish that federal funds 'participated in the installation of the warning devices' at [the crossing in question]." Id. at 672 (internal brackets deleted).  Because the particular regulation relating to the warning device had not been complied with, the court "conclude[d] that [Mrs. Easterwood's] grade crossing claim is not pre-empted." Id. at 673.

The same conclusion was not reached, however, on Mrs. Easterwood's claim the train was speeding and CSX "breached its common-law duty to

12

operate its train at a moderate and safe rate of speed." Id. "On their face, the provisions [in question] address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account.  Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that [Mrs. Easterwood] seeks to impose on [CSX]." Id. at 674.  Because the regulation "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings. . . . [the Supreme Court] conclude[d] that [Mrs. Easterwood's] excessive speed claim cannot stand . . . . under the FRSA, federal regulations adopted by the Secretary of Transportation pre-empt [her] negligence action only insofar as it asserts that [CSX's] train was traveling at an excessive speed." Id. at 675-76.  In the end, the Easterwood court allowed Mrs. Easterwood's claim of an inadequate warning device to continue (not because a federal regulation did not cover warning devices, but because the crossing device was never installed), while her claim of excessive train speed was preempted.

The Supreme Court's ruling in <u>Easterwood</u> was further clarified in <u>Norfolk Southern Railway Co. v. Shanklin</u>, 529 U.S. 344 (2000).  In <u>Shanklin</u>, the court was again faced with a widow's claim her husband's death was caused by the failure of the railroad company to "maintain adequate warning devices at a grade crossing . . . ." <u>Id.</u> at 347.  The Tennessee Department of Transportation installed "the familiar black-and-white, X-shaped signs that read 'RAILROAD CROSSING,' " using federal funds.  <u>Id.</u> at 350.  "It is undisputed that the signs at the . . . crossing were installed and fully compliant with the federal standards for such devices at the time of the accident." <u>Id.</u>  After revisiting the analysis used in <u>Easterwood</u>, the <u>Shanklin</u> court declared, "[w]hat States cannot do–once they have installed federally funded devices at a particular crossing–is hold the railroad responsible for the adequacy of those devices." <u>Id.</u> at 358.  In conclusion, the <u>Shanklin</u> court found:

> [The federal regulations] "cover the subject matter" of the adequacy of warning devices installed with the participation of federal funds. As a result, the FRSA pre-empts [Mrs. Shanklin's] state tort claim that the advance warning signs and reflectorized crossbucks installed at the . . . crossing were inadequate. . . . Once the FHWA [Federal Highway Administration] approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby pre-empting [Mrs. Shanklin's] claim.

<u>Id.</u> at 358-59.

14

### 1.  FAILURE TO WARN CLAIM

BNSF interprets plaintiff's complaint to include a claim relating to the crossbuck "RAILROAD CROSSING" sign located at the 465th Avenue Crossing where the collision occurred.  (Docket 77 at pp. 9-14).  Plaintiff does not allege BNSF should have had an alternative warning sign or device, as contemplated by federal regulations, at the 465th Avenue Crossing. "Plaintiff has not asserted a claim that BNSF had a duty to construct a different or more advanced warning system at the crossing . . . ."  (Docket 85 at p. 11).  Plaintiff's failure to warn claim is "that BNSF failed to act in compliance with its *own policy* of flagging grade crossings when hazardous conditions exist (i.e. reduced viability of the intersecting roadway)."  (Docket 85 at p. 11) (emphasis in original).

Relevant to plaintiff's failure to warn claim, the amended complaint alleges BNSF was negligent in the following manner:

> 14.  Defendant knew, or in the exercise of ordinary prudence and care should have known, that a signal or warning should be given to the general public that Defendant intended the Ballast Regulator to travel through the grade crossing, and that the grade crossing lacked any such signal or warning which would give reasonable notice to the general public of the approach of the Ballast Regulator.

> 15.  Defendant had a duty while . . . operating the Ballast Regulator across . . . the grade crossing to . . . to give due and proper signal or warning of the Ballast Regulator's approach to the grade crossing, so as to avoid causing

15

> injuries and damages to persons passing over and across the grade crossing.
>
> 16. Defendant, acting by and through its . . . employees, breached its duty by . . . negligently operating its Ballast Regulator in the following particulars:
>
>> a.   By . . . failing and neglecting to provide or maintain any reasonable form of signal or warning for the purpose of warning the general public of the approach of the Ballast Regulator;
>>
>> b.   By . . . failing to act in compliance with its own policy of stationing employees at grade crossings prior to the approach of the Ballast Regulator for the purpose of warning the general public of the approach of the Ballast Regulator . . . .

(Docket 37 at pp. 3-4).  These claimed acts of negligence are not the failure of BNSF to give warning of a <u>train</u> approaching the 465th Avenue Crossing, but the failure to give warning that a piece of <u>equipment</u>, the ballast regulator, was approaching the railroad crossing.

Plaintiff argues BNSF violated its own internal safety rules, specifically Maintenance of Way Operating Rule ("MWOR") 6.50.2.  (Docket 85 at p. 12).  That rule states:  "[o]n-track equipment must approach all grade crossings <u>prepared to stop and must yield the right of way to vehicular traffic</u>.  If necessary, <u>flag the crossing</u> to protect movement of on-track equipment."  (Docket 86-7) (emphasis added).  The BNSF Engineering Instructions also contain a rule for on-track equipment, which states:

16

14.4.1 Operating Roadway Equipment Over Grade Crossings

A. Approaching Grade Crossings

When approaching a grade crossing with rail bound equipment:

1.      Prepare to stop roadway equipment short
of the crossing. . . .

2.      When traffic conditions could be
hazardous, use a flagger to protect
movement over the crossing.

3.      Do not rely on the equipment to shunt
the track and use the proper horn signal
(2 long-short-long).

(Docket 82-2) (bold in original deleted).

The court must make a distinction between a "flagman" under the

federal regulations and the use of the terms "posting a flagger" or "flagman"

in the remainder of this analysis.  In federal regulations, use of the term

flagman "when used in relation to roadway worker safety means an

employee designated by the railroad to direct or restrict the movement of

_trains_ past a point on a track to provide on-track safety for roadway

workers, while engaged solely in performing that function."  49 C.F.R.

§ 214.7 (emphasis added).  Similarly, the terms "watchman" or "lookout"

are very specifically defined in the workplace safety regulations.

"Watchman/lookout means an employee who has been annually trained

and qualified to provide _warning to roadway workers_ of approaching trains

or on-track equipment.  Watchmen/lookouts shall be properly equipped to

17

provide visual and auditory warning such as whistle, air horn, white disk, red flag, lantern, fuse[].  A watchman/lookout's sole duty is to look out for approaching trains/on-track equipment and provide at least fifteen seconds advanced <u>warning to employees</u> before arrival of trains/on-track equipment."  49 C.F.R. § 214.7 (emphasis added).

The terms flagman, watchman and lookout when used in the workplace safety regulations have very specific definitions and workplace purposes.  Plaintiff cannot claim by the workplace safety regulations BNSF had a duty to post a watchman or lookout at the 465th Avenue Crossing to warn Mr. Skrovig of the oncoming ballast regulator.  In the context of this litigation, the use of the terms flagman or flagger by plaintiff and in BNSF's rules must be viewed in the ordinary sense, because there is no train involved in 465th Avenue Crossing collision.

The Federal Railroad Administration ("FRA") regulations declare "[t]he purpose of the national railroad safety program is to promote safety in all areas of railroad operations in order to reduce deaths, injuries and damage to property resulting from railroad accidents."  49 C.F.R. § 212.101(a).  The track safety standards proclaim the regulations:

> <u>[P]rescribe[] minimum safety requirements</u> for railroad track that is part of the general railroad system of transportation. The requirements prescribed in this part apply to specific track conditions existing in isolation.  Therefore, a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to

provide for safe operations over that track. <u>This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part</u>.

49 C.F.R. § 213.1(a) (emphasis added).   These regulations do not suggest they are only applicable to railroad employees and were to have no relationship to avoiding collisions occurring at grade crossings between motor vehicles and trains or railroad maintenance equipment.

The railroad workplace safety regulations were enacted to address railroad employee safety.  "The purpose of this part is to prevent accidents and casualties to employees involved in certain railroad inspection, maintenance and construction activities." 49 C.F.R. § 214.1(a).  Like the national railroad safety program regulations, the railroad workplace safety regulations were not intended to be the final word on the covered activities. "This part prescribes minimum Federal safety standards for the railroad workplace safety subjects addressed herein.  <u>This part does not restrict a railroad or railroad contractor from adopting and enforcing additional or more stringent requirements not inconsistent with this part</u>." <u>Id.</u> at 214.1(b) (emphasis added).

Federal regulations associated with roadway maintenance machines, such as the ballast regulator, are pertinent to the analysis.  BNSF is required to have a specific safety program for the operation of its on-track equipment.

19

> Each employer shall include in its on-track safety program specific provisions for the safety of roadway workers who operate or work near roadway maintenance machines. Those provisions shall address:
>
> > (1) Training and qualification of operators of roadway maintenance machines.
> >
> > (2) Establishment and issuance of safety procedures both for general application and for specific types of machines.
> > . . .
> > (6) Maximum working and travel speeds for machines dependent upon weather, visibility, and stopping capabilities.

Id. at 214.341(a).[9]

Important to Mr. Wise's operation of the ballast regulator is "[n]o roadway worker shall operate a roadway maintenance machine without having complete knowledge of the safety instructions applicable to that machine." Id. at 213.341(b)(2). The regulations go on to emphasize the importance of not only complying with the regulations but also the employer's own standards and rules of operation. "The purpose of this

---

[9]The FRA Final Rule comment for section 214.341 included the following statement: "FRA believes that it is most effective to promulgate a general requirement for on-track safety around roadway maintenance machines, and require that the details be provided by railroad management, conferring with their employees, and industry suppliers. Several railroads have adopted comprehensive rules that accommodate present and future machine types, as well as their own operating requirements. FRA has seen the text of such rules, as well as witnessed their application and believes that they can set examples for other railroads. The requirement for issuance of on-track safety procedures for various types of roadway maintenance machines may be met by general procedures that apply to a group of various machines, supplemented wherever necessary by any specific requirements associated with particular types or models of machines." (Docket 92-3 at p. 24) (emphasis added).

20

subpart is to prevent accidents and casualties caused by the lawful operation of on-track roadway maintenance machines . . . . <u>This subpart prescribes minimum safety standards for on-track roadway maintenance machines . . . . An employer may prescribe additional or more stringent standards that are consistent with this subpart</u>."  <u>Id.</u> at 214.501(a) & (b) (emphasis added).

    BNSF argues an alleged violation of its own rules does not create a negligence claim because the BNSF rules cited by plaintiff are not included within 49 U.S.C. § 20106(b)(1)(B).  (Docket 77 at p. 13).  Federal regulation 49 C.F.R. § 214.341 requires BNSF to develop internal rules for on-track safety for maintenance equipment such as a ballast regulator.  In plaintiff's interrogatories, BNSF was asked to disclose its "rules, regulations, policies, and procedures . . . in place [in] 2007 . . . concerning the use of Ballast Regulators."  (Docket 86-9 at p. 36).  The rules and regulations produced by BNSF were the following:

- BNSF Engineering Instructions Chapter 1 and 14;

- BNSF Maintenance of Way Operating Rules (revised May 3, 2007);

- BNSF Maintenance of Way Safety Rules (revised August 10, 2007);

- BNSF Employee Safety Rules (revised February 23, 2007);

- BNSF Mechanical Safety Rules and Policies (April 15, 2007); and

- BNSF System Special Instructions (April 29, 2007).

<u>Id.</u>

21

BNSF argues its rules are not based on "its own plan, rule, or standard that [BNSF] created pursuant to a regulation or order issued by . . . the Secretar[y]." (Docket 77 at p. 13) (citing 49 U.S.C. § 2016(b)(1)(B)). Defendant's argument the operating rules, that is, the MWOR and Engineering Rules, were not developed pursuant to a regulation of the Secretary of Transportation is without merit. (Docket 77 at p. 16). BNSF produced no other internal rules which it acknowledges were developed as required by 49 C.F.R. § 214.341.[10] If such safety rules existed, BNSF would certainly have argued those rules, not the MWOR or Engineering Rules, were generated in compliance with section 214.341.

Defendant also argues the Final Rule issued by the Federal Railroad Administration recognized section 214 was not intended to address collisions between maintenance equipment and motor vehicles. (Docket 91 at p. 12). The Summary to the Final Rule announced:

> FRA is issuing rules for the protection of railroad employees working on or near railroad tracks. This regulation requires that each railroad devise and adopt a program of on-track safety to provide employees working along the railroad with protection from

---

[10]BNSF cites Grade v. BNSF Railway Co., No. 4:09CV3162, 2010 WL 4386490 (D. Neb. Oct. 28, 2010) for the proposition plaintiff's negligence claim relating to failure to post a flagman at a crossing is preempted by the FRSA. (Docket 77 at p. 15). Grade involved a "flatbed railcar" which "formed part of a train." 2010 WL 4386490 at *1. In addressing Rule 6.32.1 of the General Code of Operating Rules (5th ed. Apr. 3, 2005), the court found "[t]here is no showing the rule was created pursuant to a regulation or order issued by the Secretary of Transportation." Id. at *2.

> the hazards of being struck by a train or other on-track
> equipment. . . . The program adopted by each railroad would be
> subject to review and approval by FRA.

(Docket 92-3 at p. 1).  BNSF asserts its MOWR and Engineering Rules are

intended only to address safety of "BNSF employees, not the motoring

public." (Docket 91 at p. 13).  BNSF argues its "MWOR and Engineering

Instructions are separate sets of model operating rules that a railroad may

adopt if it chooses and that it may amend to suit its needs." (Docket 77 at

p. 16).

The "Scope of the Rule" section of the Final Rule contradicts BNSF's

argument.  Within the Scope of the Rule it is declared:

> Neither FRA nor the Advisory Committee discussed or intended to
> address the hazards that vehicular traffic at grade crossings pose
> for roadway workers. . . . Although some risk may exist, FRA
> believes that the risk is not significant and that adequate
> voluntary measures are being taken to protect roadway workers
> at highway rail grade crossings.

(Docket 92-3 at p. 5) (emphasis added).  The MWOR and Engineering Rules

are the type of voluntary measures contemplated by various highway safety

and railroad regulations which permit a railroad to adopt and enforce

additional or more stringent safety rules not inconsistent with the federal

regulations.  See 49 C.F.R. § 213.1(a) [national railroad track safety

standards) and 49 C.F.R. § 214.1(b) [railroad workplace safety regulations].

Federal regulations also require BNSF to create a safety program for the

operation of its on-track equipment, particularly concerning "[m]aximum

23

working and travel speeds for machines dependent upon weather, visibility, and stopping capabilities."  49 C.F.R. § 214.341(a)(6); <u>see also</u> 49 C.F.R. § 214.501(a) & (b).

The "BNSF Safety Vision" introducing the MWOR manual sections states:

> We believe every accident or injury is preventable. Our vision is that BNSF will operate free of accidents and injuries. BNSF will achieve this vision through:
>
> **A culture** that makes safety our highest priority and provides continuous self-examination as to the effectiveness of our safety process and performance . . .
>
> **A work environment**, including the resources and tools, that is safe and accident-free where all known hazards will be eliminated or safeguarded . . .
>
> **Work practices and training** for all employees that make safety essential to the tasks we perform . . .
>
> **An empowered work force**, including all employees, that takes responsibility for <u>personal safety, the safety of fellow employees, and the communities in which we serve</u>.

(Docket 86-10 at p. 1) (bold in original, underlining added).  MWOR 6.50.2 is the type of company rule contemplated by federal regulations to promote not only safety for railroad employees but the safety of the public as well.

Randy Miller, a BNSF surface gang foreman, testifying about MWOR 6.50.2 stated, "you approach every crossing under control, being able to stop.  And, if there's corn or buildings or whatever, you know, you take that into account; and you approach a crossing prepared to stop if you need to."

24

(Docket 78-3 at p. 5 [p. 57:5-9]).  Mr. Skrovig's sister-in-law, Charlene Alverson, testified Mr. Miller, who was part of Mr. Wise's maintenance crew, explained to her how the collision occurred.

> I asked him just, "How did this happen?" And he told me that there were two pieces of equipment. . . . He said that the one piece of equipment was in front of the other, and, in the intersection before the accident site, he had waited until the second piece of equipment went through the intersection.  Then he went around the section; and, by the time he got to the corner, they had already hit.

(Docket 86-15 at p. 2 [p. 9:13-23]).  Defendant objects to this statement by Ms. Alverson as hearsay.  (Docket 91 at p. 15).  BNSF argues the statement by Ms. Alverson does not mean to suggest Mr. Miller was "flagging railroad crossings . . . only that he was stopped at a crossing." Id.  Depending upon how a jury views Ms. Alverson's testimony, Mr. Miller's out-of-court statement may be an admission of a party-opponent admissible under Fed. R. Evid. 801(d)(2).  It is for a jury to determine what Mr. Miller said, if anything, and what he meant.

The court concludes MWOR 6.50.2 and Engineering Rule 14.4.1 are company rules which federal regulations contemplate should be adopted and enforced by BNSF.  These rules come within the scope of the federal regulations upon which plaintiff may base her state tort claim action for negligence.  Alternatively, the rules come within the exemption from preemption under 49 U.S.C. 20106(b)(1)(B).  "[P]re-emption will not lie

25

unless it is 'the clear and manifest purpose of Congress." Easterwood, 507 U.S. at 664 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).

Because there are questions of fact as to whether BNSF's employee Mr. Wise complied with the BNSF rules and whether BNSF should have posted a flagman or otherwise warned Mr. Skrovig of the approaching ballast regulator at the 465th Avenue Crossing, defendant's motion for summary judgment as to plaintiff's failure to warn claim is denied.

### 2. VEGETATION

"Plaintiff has not made the claim that BNSF was negligent because it failed to clear vegetation located on its property." (Docket 85 at p. 26). "Rather, Plaintiff is alleging that the operator of the ballast regulator breached his duty of care by failing to yield to vehicular traffic and make a proper lookout before entering the grade crossing.  The operator's lack of visibility regarding vehicular traffic on the intersecting road due to the presence of a nearby corn field is a fact relevant to this claim." Id.

The track safety standards of the FRA discuss the duty of a railroad to control vegetation.  49 C.F.R. § 213.37 provides:

> Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not—
>
> (a) Become a fire hazard to track-carrying structures;
>
> (b) Obstruct visibility of railroad signs and signals:

> (1) Along the right-of-way, and
>
> (2) At highway-rail crossings . . . .
>
> (c) Interfere with railroad employees performing normal trackside duties;
>
> (d) Prevent proper functioning of signal and communication lines; or
>
> (e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

Id.

The corn growing on a farmer's land adjacent to the 465th Avenue Crossing is not subject to this regulation.  "Section 213.37(b) and (d) obviously contemplate that overgrown vegetation could be hazardous to motorists at railroad crossings, but imposes only the duty to prevent the vegetation in and adjacent to the railbed from disrupting signs and signals. The Secretary did not impose a broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains.  Instead, the regulations governing maximum operational speed account for such conditions and safety hazards."  O'Bannon v. Union Pacific Railroad Co., 960 F. Supp. 1411, 1422-23 (W.D. Mo. 1997).

Similarly, how a ballast regulator operator responds to a reduced visibility situation at a grade crossing is governed by 49 C.F.R. § 213.341 and BNSF's rules, MWOR 6.50.2, Engineering Rule 4.14.1, and MWOP 6.50.1.  The workplace safety regulations set the standard for speed in the

operation of the ballast regulator. "Restricted speed means a speed that will permit . . . other equipment to stop within one-half the range of vision of the person operating the . . . other equipment, but not exceeding 20 miles per hour, unless further restricted by the operating rules of the railroad." 49 C.F.R. § 214.7.

MWOR 6.50.1 is BNSF's on-track equipment speed rule. (Docket 86-10 at p. 25). After specifying maximum speed for on-track equipment, the rule includes a general exception, which states:

> When determining the proper speed, take into consideration the following:
>
> • Track conditions, such as grade, curvature and rail condition.
>
> • Load.
>
> • Sight distance.
>
> • Visibility.
>
> • Other conditions that might adversely affect the safe operation of on-track equipment.

Id. Like MWOR 6.50.2, this rule places an obligation on the BNSF employee operating the ballast regulator to proceed in a manner dictated by visibility, not only on the track but also within the line-of-sight which would affect safe operation of BNSF's equipment.

Defendant's argument that analysis of this collision is controlled by O'Bannon, 960 F. Supp. 1411, and Van Buren v. Burlington Northern Santa

28

Fe Railroad Co., 544 F. Supp. 2d 867 (D. Neb. 2008), is not compelling.
Both of those cases involved the operation of a train adjacent to a cornfield
and not a much smaller and shorter ballast regulator which could be hidden
behind and below the height of the corn.  Trains have different, more
detailed regulations governing their operation, while use of on-track
equipment is more appropriately left to the railroad's operations and safety
rules.

Plaintiff alleges Mr. Wise breached his duty of care and further claims
the cornfield so severely restricted his view as to heighten that duty.
(Docket 85 at p. 30).  Plaintiff alleges Mr. Wise was reprimanded because of
a violation of MWOR 6.50.2.  (Docket 85, p. 4).  BNSF counters Mr. Wise
"chose[] to accept a record suspension rather than go through the
evidentiary process and hearing to determine *if* there was any violation of
the rule." (Docket 91 at p. 5) (emphasis in original).  But BNSF admits Mr.
Wise "did execute [a] Letter of Reprimand on September 10, 2007."  (Docket
86-9 at p. 29).  Whether BNSF or its employee failed to comply with BNSF
rules of operation of on-track equipment is a jury question which precludes
summary judgment on this claim.

### 3.  CONTRIBUTORY NEGLIGENCE

BNSF moves for summary judgment asserting "[Mr.] Skrovig was
contributorily negligent to a degree which was more than slight, and this

29

may be determined as a matter of law.  He engaged in both ordinary

negligence and negligence per se when he violated a safety statute without a

legal excuse. . . and that contributory negligence bars [plaintiff's] claim."

(Docket 77 at p. 22).  Defendant argues Mr. Skrovig was negligent *per se*

because he violated SDCL § 32-25-13.  (Docket 77 at p. 30).  That statute

provides:

> When approaching within fifty feet of a grade crossing of any
> railway when the driver's view is obstructed, the maximum speed
> shall be fifteen miles per hour. A driver's view is obstructed if at
> any time during the last two hundred feet of his approach to such
> crossing he does not have a clear and uninterrupted view of any
> traffic on such railway for a distance of four hundred feet in each
> direction. A violation of this section is a Class 2 misdemeanor.

Id.

"Violation of a safety statute is negligence as a matter of law unless it

is legally excused."  Dartt v. Berghorst, 484 N.W.2d 891, 896 (S.D. 1992).

"A legal excuse . . . must be something that would make it impossible to

comply with the statute."  Id. at 896 (internal citation omitted).  The South

Dakota Supreme Court identifies four circumstances which excuse

compliance with a safety statute.  Those are:

> (1)  Anything that would make compliance with the statute
>      impossible;
>
> (2)  Anything over which the driver has no control which
>      places his car in a position violative of the statute;
>
> (3)  An emergency not of the driver's own making by reason
>      of which he fails to observe the statute; and

(4)  An excuse specifically provided by statute.

Id. (internal citation omitted).  "Noncompliance must be caused by circumstances beyond the driver's control and not produced by his own misconduct."  Id.

The undisputed facts disclose that during the last 200 feet of Mr. Skrovig's approach to the railroad crossing, the corn growing on the northeast quadrant of the crossing prevented him from having a clear, uninterrupted view of the last 400 feet of the railroad track approach to the 465th Avenue Crossing.  The speed of Mr. Skrovig's pickup as it entered the railroad crossing, however, is disputed.

Defendant's expert claims the pickup was "traveling at a speed greater than 15 miles per hour, and was likely traveling at least 30 mph."  (Docket 83 at p. 3, ¶ 10(b)).  Plaintiff's expert reports that with a 3:1 ratio–indicating a vehicle speed differential of the same ratio–if the ballast regulator was traveling at 10 miles per hour, the pickup would then have been traveling at 30 miles per hour.  (Docket 94-2 at p. 7).  However, if the change in Mr. Wise's testimony is credible and the ballast regulator was only going 5 miles per hour, then the 3:1 speed ratio would place Mr. Skrovig's pickup traveling at 15 miles per hour.

"[C]redibility is for the jury to decide."  Baddou v. Hall, 2008 SD 90, ¶ 29, 756 N.W.2d 554, 561-62 (internal citation omitted).  "[I]ssues of

31

negligence, contributory negligence, and the comparative extent thereof, and proximate cause are ordinarily questions of fact and it must be a *clear* case before a trial judge is justified in taking these issues from the jury."   Id. at 2008 SD ¶ 30, 756 N.W.2d at 562 (internal citation omitted) (emphasis in original).

Even if the court were to find Mr. Skrovig was negligent, his negligence must still be compared to defendant's negligence to bar plaintiff from recovery.   SDCL § 20-9-2 provides:

> In all actions brought to recover damages for injuries to a person or to that person's property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence does not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant, but in such case, the damages shall be reduced in proportion to the amount of plaintiff's contributory negligence.

Id.   "The term slight in SDCL § 20-9-2 has been defined to mean small in quantum in comparison with the negligence of the defendant."   Estate of He Crow v. Jensen, 494 N.W.2d 186, 188 (S.D. 1992) (internal citation and quotation marks omitted).   "It is a question of fact which varies with the facts and circumstances of each case whether a plaintiff's negligence is slight compared to that of the defendant."   Id.

For these reasons, defendant's motion for summary judgment based on a claim of plaintiff's negligence *per se* or contributory negligence greater than slight so as to bar recovery is denied.

32

**ORDER**

Based on the above analysis, it is hereby

ORDERED that defendant's motion to strike and objection to

affidavits (Docket 95) is denied.

IT IS FURTHER ORDERED that defendant's motion for summary

judgment (Docket 76) is denied.

Dated March 5, 2012.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

33