UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| TAMI SKROVIG, as Personal Representative of the Estate of Thomas Jeffrey Skrovig, deceased, | ) ) ) ) | CIV. 10-4022-JLV |
| Plaintiff, | ) ) ) | ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER |
| vs. | ) ) | OF LAW OR NEW TRIAL |
| BNSF RAILWAY COMPANY, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff Tami Skrovig ("plaintiff" or "Mrs. Skrovig") filed an amended

complaint asserting various claims of negligence against defendant BNSF

Railway Company ("BNSF") arising from a pickup and railroad maintenance

machine collision in which her husband, Thomas Skrovig ("Mr. Skrovig"),

died. (Docket 37). Defendant's answer denies plaintiff is entitled to

recovery, asserting BNSF was not negligent; some, if not all, of plaintiff's

negligence claims are preempted by federal law; and if BNSF was negligent,

Mr. Skrovig was negligent as a matter of law and his contributory negligence

was greater than slight thereby barring recovery. (Docket 38). The case was

tried to a jury on April 23, 2012, through May 2, 2012. On May 2, 2012,

the jury entered a verdict of $2,000,000 in favor of plaintiff and against

defendant. (Docket 192). The court entered a judgment on that same day

in favor of plaintiff.  (Docket 193).  An amended judgment including

prejudgment interest was filed on June 28, 2012.  (Docket 217).

Defendant timely filed a motion to set aside the verdict and for

judgment as a matter of law in favor of BNSF under Fed. R. Civ. P. 50(b)[1] or,

in the alternative, a motion for new trial under Fed. R. Civ. P. 59.  (Docket

211).  Plaintiff resists the motion in its entirety.  (Docket 216).  For the

reasons set forth below, defendant's motions are denied.

## DISCUSSION

## A.    MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant asserts a number of grounds upon which it argues BNSF is

entitled to judgment as a matter of law.  Those grounds are summarized as:

1. Plaintiff's "failure to warn" claims are preempted under
   federal law;

2. Plaintiff's "failure to yield" claims are preempted under
   federal law;

3. Defendant's internal company rules do not establish a
   federal standard of care; and

4. Defendant's internal company rules do not establish a
   standard of care under South Dakota Law.

_____

[1]Defendant made a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) at the close of plaintiff's case-in-chief.  (Docket 187).  That motion was denied.  See partial transcript of jury trial (Docket 204 at pp.3-28 & 32-42); see also Dockets 196 at pp. 11 & 197.  Defendant's renewed motion at the close of all the evidence was also denied.  (Docket 196 at p. 12).  Defendant did not order the entire trial transcript.

(Docket 212 at pp. 8-16).  The first three claims are legal issues and the fourth has both a legal and factual component.  Each claim will be addressed separately.

### 1. PLAINTIFF'S "FAILURE TO WARN" CLAIMS ARE PREEMPTED UNDER FEDERAL LAW

BNSF argues one of plaintiff's claims presented to the jury was a "failure to warn" claim relating to the crossbuck "RAILROAD CROSSING" sign located at the 465th Avenue Crossing where the collision occurred.  See Docket 212 at p. 9.  "Plaintiff [never] asserted a claim that BNSF had a duty to construct a different or more advanced warning system at the crossing . . . ."  (Docket 85 at p. 11).  The court granted BNSF's pretrial motions *in limine* relating to evidence regarding the crossbuck signs.  (Docket 167 at p. 4, ¶¶ 20 & 33, p. 7, ¶¶ 8, 9, 10, 11, 12, 13, & 14).  Plaintiff never offered evidence, nor did the jury ever consider evidence, regarding inadequacy of the crossbuck sign or an associated "failure to warn" claim.  Defendant's argument regarding the crossbuck sign is without merit.

The only "failure to warn" claim which plaintiff presented at trial and upon which the jury heard evidence was a  "failure to warn" claim arising out of BNSF's internal rules.  Those BNSF rules were Maintenance of Way Operating Rule 6.50.2 ("MOWOR 6.50.2") (trial exhibit 6 and 6A) and Engineering Rule 14.4.1 ("Eng. R. 14.4.1") (trial exhibit 9 and 9A) (collectively "BNSF internal rules").  The "failure to warn" claim involved

3

evidence those rules required a flagger at the railroad crossing in advance of the arrival of the ballast regulator to warn any approaching vehicular traffic (the "flagging claim").

After an extensive hearing on the federal preemption issue outside the presence of the jury (Docket 186) and after considering defendant's motion for judgment as a matter of law at the close of plaintiff's case, the court granted defendant's motion and removed the "failure to warn" flagging claim from the jury's consideration. (Docket 204 at pp. 32-34). The court then required the redaction of MOWOR 6.50.2 and Eng. R. 14.4.1 to remove any duty to warn language. Id. at pp. 33-35. The court also gave the jury a curative instruction, consistent with those rulings.

> Plaintiff's claim that Defendant failed to properly flag the crossing before the ballast regulator entered the crossing is no longer part of this case. So you will not decide that claim. You should not concern yourselves why this claim is not part of the case. You should decide the case based solely on the evidence on the remaining claims before you.

Id. at p. 49.

Defendant's argument regarding claims of "failure to warn" are without merit and its motion for judgment as a matter of law on this basis is denied.

## 2. PLAINTIFF'S "FAILURE TO YIELD" CLAIMS ARE PREEMPTED UNDER FEDERAL LAW

Defendant argues plaintiff's "failure to yield" claims arising out of MOWOR 6.50.2 and Eng. R. 14.4.1 cannot be the basis of a claim because "[t]he Federal Railroad Administration ("FRA") has promulgated federal regulations that substantially subsume the subject matter of the movement and safety of on-track railroad maintenance equipment."  (Docket 212 at p. 10) (referencing 49 C.F.R. Part 214).  BNSF argues "[t]he FRA considered and rejected a proposal to promulgate additional regulations to protect railroad workers from accidents with vehicle traffic at highway-rail grade crossings."  Id. (referencing footnote 6–trial exhibit 821–FRA Final Rule 61 FR 65959, 1996 WL 7160808 (Dec. 16, 1996) at pp. 4-5, 28 and 32).  "Where the FRA determines that a particular regulation is not justified, that determination has the same preemptive effect as the adoption of a regulation."  Id. at n. 6.  At the motion for judgment as a matter of law hearing at the close of plaintiff's case-in-chief, BNSF counsel described this as "negative preemption."  (Docket 204 at p. 5).

During the federal preemption hearing, Arthur Charrow, BNSF General Director of Maintenance Planning, testified the BNSF internal rules were "not covered by federal regulations."  (Docket 186 at p. 70).  Mr. Charrow acknowledged BNSF internal rules were in existence before there was a FRA.  Id. at pp. 14-17.  He also acknowledged that when Part 214 of

5

the Code of Federal Regulations Title 49 was published, rules for protecting

the traveling public at railroad grade crossings were outside the scope of the

FRA. Id. at p. 18. During that same hearing, counsel for BNSF

acknowledged the BNSF internal rules were not subject to a federal

preemption analysis:

| THE COURT: | So is Plaintiff's claim that 6.50.2 was violated by Mr. Wise's failure to yield -- forget the flagging issue, just the failure to yield -- is that a claim that's preempted? **Plaintiff's claim, first sentence says 6.50.2, Wise's failure to yield with the ballast regulator, is that preempted**? |
|---|---|
| MR. SATTLER: | Without having the flagger piece -- |
| THE COURT: | Just forget the flagger for a moment. |
| MR. SATTLER: | I think it's vulnerable under state law. I don't think it's -- **I don't think it's a federal preemption related issue**. |
| THE COURT: | **It survives the preemption analysis?** And I'm not trying to play cute with your position. I'm trying to understand it. |
| MR. SATTLER: | **If it's segregated from the flagging.** |

Id. at p. 49 (emphasis added).

Mr. Charrow then put the federal preemption claim to rest regarding

the BNSF internal rules.

Q  What about the duty of an operator to be prepared to stop or yield . . . to vehicular traffic, is there any federal regulations that govern that for ballast regulators or maintenance vehicles?

A  That's our regulations, [sic] not federal.

Q   Pardon?

A   **Those are our regulations, not federal, our rules**.

Id. at p. 71  (emphasis added).

Counsel for BNSF reconfirmed this conclusion during the motion for

judgment as a matter of law hearing at the close of plaintiff's case-in-chief.

| | |
|---|---|
| THE COURT: | On the flagging issue. If you excise the final sentence of 6.50.2 that has the word "flag" in it. |
| MR. SATTLER: | My argument -- and I think **I conceded this last time we spoke about this, Judge** -- my position is that if that last sentence comes out, that takes care of the -- **I'm just talking about the preemption issue** . . . . |
| . . . . | |
| THE COURT: | If that's excised [flagging language] from 6.50.2, and the first sentence of that operating rule, on-track equipment must approach all grade crossings prepared to stop and must yield the right of way to vehicular traffic, **that's not subject to preemption?** |
| MR. SATTLER: | **As I said before, my argument would be that it isn't.** |
| THE COURT: | **It's not preempted?** |
| MR. SATTLER: | **It is not.** . . . |
| . . . . | |
| THE COURT: | And if excised [the flagging language ]from 14.4.1, if that's -- that is taken away from the jury, **the balance of this Engineering Instruction is not subject to preemption?** |

MR. SATTLER: **With the other cautionary language I use without having to repeat it, I agree.**

(Docket 204 at pp. 19 & 21-22) (emphasis added).

Based on the extensive federal preemption hearing and the discussion with counsel, the court concluded the duty to yield provisions of the BNSF internal rules were not subject to federal preemption. The court further ruled under Grade v. BNSF Railway Company, 676 F.3d 680 (8th Cir. 2012), plaintiff's "failure to flag" claims were "preempted as a claim that constitutes an argument that there should have been an active signal or warning at the crossing . . . ." (Docket 204 at p. 33). The court holds these rulings were sound and are proper legal conclusions in light of the evidence and arguments presented.[2]

There are two additional reasons why BNSF's challenge of federal preemption fails. First, "judicial admissions are binding for the purpose of the case in which the admissions are made including appeals." State Farm Mutual Automobile Insurance Co. v. Worthington, 405 F.2d 683, 686 (8th Cir. 1968). "A judicial admission has been held to be conclusive on the

---

[2]To the extent the court's analysis in the March 5, 2012, order (Docket 116) [cited at 855 F. Supp. 2d 933] is inconsistent with this order and the court's rulings during the federal preemption hearing, the analysis in the March 5, 2012, order is vacated. This decision does not affect the overall result of denying defendant's motion for summary judgment. (Docket 76). See Docket 116 at p. 33.

party by whom it was made, or to whom it is attributable." <u>Wiget v. Becker</u>, 84 F.2d 706, 711 (8th Cir. 1936). "A judicial admission trumps evidence." <u>Murrey v. United States</u>, 73 F.3d 1448, 1455 (7th Cir. 1996).

Second, having agreed with the court during the course of trial that federal preemption does not apply to BNSF's internal rules, defendant cannot make a contrary claim post-trial. If the court erred in allowing BNSF internal rules to be used to evaluate the negligence, if any, of the defendant, BNSF is barred from now raising this argument in its post-trial motions. "The doctrine of invited error applies when the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action." <u>Matthew v. Unum Life Insurance Company of America</u>, 639 F.3d 857, 868 (8th Cir. 2011) (internal quotation marks omitted). "Under the invited error doctrine, [a]n erroneous ruling generally does not constitute reversible error when it is invited by the same party who seeks on appeal to have the ruling overturned." <u>Id.</u> (internal quotation marks omitted). <u>See also</u> <u>Federal Crop Ins. Corp. v. Hester</u>, 765 F.2d 723, 727 (8th Cir. 1985) ("It is fundamental that where the defendant . . . invited error there can be no reversible error.") (internal quotation marks omitted).

Defendant's argument regarding claims of "failure to yield" are without merit and its motion for judgment as a matter of law on this basis is denied.

### 3. DEFENDANT'S INTERNAL COMPANY RULES DO NOT ESTABLISH A FEDERAL STANDARD OF CARE

Defendant argues the court used BNSF internal rules to "establish a federal standard of care under the FRSA." (Docket 212 at p. 13). For defendant's argument to have merit, there must exist a federal regulation which creates an "ongoing, federal standard of care . . . . under which [the] railroad is expected to act[.]" Grade, 676 F.3d at 686. Defendant agreed the BNSF internal rules were not promulgated under the direction or requirement of the FRA. It is clear from the testimony of Mr. Charrow BNSF internal rules were "not covered by federal regulations." (Docket 186 at p. 70).

The court never ruled BNSF internal rules were being used to create a federal standard of care. "[T]his is not a case where Plaintiff on her surviving claims is challenging BNSF under a federal standard of care." (Docket 204 at p. 8). BNSF internal rules were presented to the jury for their consideration in determining defendant's negligence under South Dakota common law. See final instructions to the jury (Docket 189).

Defendant's argument is without merit and its motion for judgment as a matter of law on this basis is denied.

### 4. DEFENDANT'S INTERNAL COMPANY RULES DO NOT ESTABLISH A STANDARD OF CARE UNDER SOUTH DAKOTA LAW

Defendant argues MOWOR 6.50.2 and Eng. R. 14.4.1 "do not create a duty or actionable standard of care under state law." (Docket 212 at p. 14). Defendant argues BNSF internal rules "are not determinative of the standard of care." Id. (citing Wuest ex. rel. Carver v. McKennan, 619 N.W.2d 682, 689 (S.D. 2000). Without BNSF internal rules, defendant argues "a reasonable jury did not have sufficient evidence to support any claim of negligence against defendant." Id.

The court will first address the legal issue posed by defendant's argument. In South Dakota, "[e]very person is responsible for injury to the person . . . of another caused by his willful acts or caused by his want of ordinary care or skill, subject in the latter cases to the defense of contributory negligence." SDCL § 20-9-1. " 'Person' includes natural persons, partnerships, associations, cooperative corporations, limited liability companies, and corporations . . . ." SDCL § 2-14-2(18). "SDCL 20-9-1 is a simple codification of the common law of negligence. In essence, then, the South Dakota Constitution and existing statutory law provide that an injured person has a right to a remedy against a wrongdoer." Sander v. Geib, Elston, Frost Professional Association, 506 N.W.2d 107, 129 (S.D. 1993) (J. Sabers concurring).

Defendant BNSF may be held responsible in a negligence claim when one of its employees injures another person through "want of ordinary care . . . ." SDCL § 20-9-1. It is established law in South Dakota when an employee violates one of the employer's internal safety rules, that violation may be considered by the jury as evidence of negligence. Morrison v. Mineral Palace Limited Partnership, 603 N.W.2d 193, 197 n. 4 ("failure to comply with a company rule does not constitute negligence per se; the jury may consider the rule, but the policy does not set forth a standard of conduct that establishes what the law requires of a reasonable person under the circumstances.").

Defendant's affinity for a single statement from Wuest ex. rel. Carver takes that quotation out of context. (Docket 212 at p. 14). In Wuest ex. rel. Carver, plaintiff "argue[d] the trial court erred by failing to clearly instruct that a violation of hospital policy was evidence of negligence." Wuest ex. rel. Carver , 619 N.W.2d at 689. "The instruction given according to Carver simply advised the jury to consider these policies when determining standard of care." Id. The Wuest court's jury instruction contained the following liability language:

> McKennan Hospital had the duty to provide medical care to Mr. Carver which was commensurate with standard medical care available in the same or similar communities or in hospitals generally. You may take into consideration the hospital's own standards when determining standard of care. The failure to perform such duty is negligence.

Id. at 688.  The South Dakota Supreme Court concluded this instruction was

a proper statement of the law.

> We find no error in the given instruction. The standard of care to
> which a hospital must comply is to provide that care which is
> available at hospitals within the same or similar communities
> . . . . Public policy encouraging standards higher than generally
> employed in the community dictates that individual hospital
> policies are not determinative of the standard of care. . . .the given
> instruction correctly stated the law and allowed the jury to
> consider the standard of care and balance McKennan's policy with
> those of the same or similar hospitals in the community.

Id. at 689.

> In the present case, the court found from the evidence:

> [BNSF] internal rules [were] adopted . . . [to] create . . . an internal
> safety rule on the part of BNSF to which all of the BNSF employees
> involved in this case have testified . . . those two . . . internal rules
> are in place to protect railway workers, railway equipment and the
> motoring public.  Therefore, there's a duty created on the part of
> BNSF . . . which under South Dakota law, a corporate entity, an
> employer is entirely free to adopt those, but once adopted . . . and
> in this case, once the employees are actually instructed that this
> is a safety rule and you are to be concerned about the motoring
> public . . . . That's an internal rule that . . . can be considered by
> a jury in a negligence case.  Not that it creates negligence per se
> if violated, but that it is part of the determination of a jury as to
> whether or not BNSF was negligent, if its ballast regulator
> approached an intersection not yielding the right of way and not
> prepared to stop.

(Docket 204 at pp. 8-9).  This analysis is consistent with both Morrision and

Wuest ex. rel. Carver, as well as Linden v. CNH Ameria, LLC, 673 F.3d 829

(8th Cir. 2012).  (Docket 204 at pp. 12-13).  The court's final instruction

number 14 properly stated the duty of BNSF under South Dakota common law. (Docket 189 at p. 18).

The second part of defendant's argument requires a review of the evidence presented at trial. Defendant's motion for judgment as a matter of law can only be granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [plaintiff] . . . ." Fed. R. Civ. P. 50(a). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Howard v. Missouri Bone & Joint Center, Inc., 615 F.3d 991, 995 (8th Cir. 2010) (internal quotation marks and citation omitted). The court "must not engage in a weighing or evaluation of the evidence or consider questions of credibility . . . and . . . must give great deference to the jury's verdict." Id. (internal quotation marks and citations omitted).

The court may not reverse a jury's verdict unless it finds "no reasonable juror could have returned a verdict for the non-moving party." Anderson Marketing, Inc. v. Maple Chase Co., 241 F.3d 1063, 1065 (8th Cir. 2001) (citation and internal quotation marks omitted); see also Structural Polymer Group, Ltd. v. Zoltek Corp., 543 F.3d 987, 991 (8th Cir. 2008) ("In reviewing the sufficiency of the evidence to support the jury's verdict, [the court] interpret[s] the record in a light most favorable to the prevailing party,

14

affirming unless no reasonable juror could have reached the same conclusion.").

The court will summarize the material testimony on liability in the light most favorable to support the jury's verdict.[3] <u>Anderson Marketing, Inc.</u>, 241 F.3d at 1065; <u>Structural Polymer Group, Ltd.</u>, 543 F.3d at 991.

On the clear summer morning, August 21, 2007, at around 11 a.m., BNSF employee Dwight Wise operated a piece of BNSF on-track maintenance equipment, specifically a Kershaw Ballast Regulator ("ballast regulator"), on a railroad track in rural Minnehaha County, South Dakota. Behind Mr. Wise was another BNSF employee operating another piece of on-track maintenance equipment. Mr. Wise and the other employee left Sioux Falls, South Dakota, with the ballast regulator and the other piece of equipment on the rails and were en route to Wentworth, South Dakota, to work on a railroad crossing.

As the ballast regulator[4] approached the railroad tracks' intersection with 465th Avenue (the "465th Avenue Crossing" or "railroad crossing")

---

[3]The summary will be based on the court's recollection of the testimony and trial notes as defendant did not order a transcript of the evidence presented to the jury.

[4]The ballast regulator had an overall length of approximately 35'1" and an overall height of 11'8" to the top of equipment located on the roof of the cab. The front portion of a ballast regulator has a protruding nose with smaller dimensions. Trial exhibit 162. <u>See also</u> trial exhibits 11-115, 104, 114, 125, 135 & 220.

heading west, Mr. Skrovig was driving his red Toyota Tundra pickup south

on 465th Avenue toward the 465th Avenue Crossing. During the last 200

feet of Mr. Skrovig's approach to the railroad crossing, corn growing on the

northeast quadrant of the crossing[5] would have prevented him from having

a clear, uninterrupted view of the ballast regulator during the last 400 feet

of the ballast regulator's approach to the 465th Avenue Crossing. The view

for both Mr. Skrovig and Mr. Wise was obstructed as they approached the

railroad crossing where the pickup and ballast regulator collided. The

ballast regulator struck Mr. Skrovig's pickup on the driver's side and

pushed the pickup approximately 50 feet in a westerly direction along the

railroad tracks. Mr. Skrovig died as a result of the collision.

 Mr. Wise, the only surviving eyewitness to the collision, initially

reported to a law enforcement officer the speed of the ballast regulator was

between 10-15 miles per hour at the time of collision. At trial, Mr. Wise

changed his estimate to 5 miles per hour.

 The railroad crossing, which is identified as DOT No. 097327S, was

marked by crossbuck signs which were present and operational at the time

of the collision and were not obscured by any objects or vegetation. The

crossbuck sign facing southbound motorists had reflective material on the

---

[5]Trial testimony reported the corn was full grown and was nearly eight feet high or slightly higher in this quadrant. Trial exhibits 140 & 147.

front of the sign face, the part of the crossbuck that forms an "x" and is marked with the words "railroad crossing."

Mr. Wise had taken BNSF Maintenance of Way Operational Rules training several times.[6]  See also trial exhibit 10.  The "BNSF Safety Vision" introducing the MOWOR manual states:

> We believe every accident or injury is preventable. Our vision is that BNSF will operate free of accidents and injuries. BNSF will achieve this vision through:
>
> **A culture** that makes safety our highest priority and provides continuous self-examination as to the effectiveness of our safety process and performance . . .
>
> **A work environment**, including the resources and tools, that is safe and accident-free where all known hazards will be eliminated or safeguarded . . .
>
> **Work practices and training** for all employees that make safety essential to the tasks we perform . . .
>
> **An empowered work force**, including all employees, that takes responsibility for personal safety, the safety of fellow employees, and the communities in which we serve.

Trial exhibits 6 & 6A.  Mr. Wise's training included instruction on MOWOR 6.50.2.  That rule provided "[o]n-track equipment must approach all grade crossings prepared to stop and must yield the right of way to vehicular traffic. . . ."  Id.; see also final instruction number 15 (Docket 189 at p. 19).

---

[6]Mr. Wise never operated a ballast regulator prior to May of 2007.  The fatal collision occurred in August 2007.

Mr. Wise understood this rule required a BNSF employee to approach a crossing at a slow enough speed so the on-track equipment could come to a complete stop and yield the right-of-way to any vehicular traffic which might be at the crossing.  He testified MOWOR 6.50.2 imposed a duty upon him to yield the right-of-way to vehicles crossing the tracks.  He acknowledged when operating the ballast regulator on earlier occasions he had yielded the right-of-way to vehicular traffic.  He testified he did not know if he "really" had an obligation to yield the right-of-way and admitted he did not yield the right-of-way to Mr. Skrovig's pickup.

Mr. Wise was also trained on BNSF Engineering Instructions, including Eng. R. 14.4.1.  Trial exhibits 9 & 9A.  That rule for on-track equipment states:

**14.4.1 Operating Roadway Equipment Over Grade Crossings**

A. Approaching Grade Crossings

When approaching a grade crossing with rail bound equipment:

1.   Prepare to stop roadway equipment short of the crossing. . . .

Id. (bold in original).  Mr. Wise acknowledged this rule applied to his operation of the ballast regulator.  He testified he did not understand the rule.

Mr. Wise testified that as the ballast regulator was traveling westbound down a slight decline toward the railroad crossing with 465th Avenue, he was traveling at 30 miles per hour.  His view toward the right (north–the direction from which Mr. Skrovig's pickup was approaching the

crossing) was obstructed by corn. However, when confronted with his deposition testimony, Mr. Wise acknowledged he could still see the road to the north over the corn.[7]

Mr. Wise testified that about 10 seconds before he got to the crossing he blew the ballast regulator horn in a 2 long–1 short–1 long sequence.[8] Mr. Wise said he was in the process of slowing, but by the time he saw the Skrovig pickup the ballast regulator was unable to come to a stop before entering the railroad crossing.

Mr. Wise did not pull the brake lever at the middle-bottom of the instrument panel, but rather moved the propel lever back which–as a hydrostatic device–had the effect of reducing the throttle and engine speed to slow the ballast regulator down.[9] The front end of the ballast

---

[7]The day after the collision, Mr. Wise and his BNSF supervisor, Tom Neeser, returned to the location and took video of the path traveled by the ballast regulator. They did not shoot any video toward the north which would have disclosed the nature and quality of the sight-line Mr. Wise would have had of the road traveled by Mr. Skrovig. The video was shown to the jury. Trial exhibit #721.

[8]One of Mr. Skrovig's sons, Brian, testified he heard a "train horn" from Colton, South Dakota, but did not know the distance the sound was away from his location or the exact time he heard the horn. Two other witnesses, Jon Randby and Jason Egger, who were working for Skrovig Construction approximately 1/2 mile away from the crossing, testified they did not hear any train horn during the relevant time period.

[9]See trial exhibits 11-178, 11-179, 11-180, 162 at pp. 3-2 & 3-6, 212 & 213.

regulator[10] struck the pickup at the driver's door and pushed the pickup approximately 50 feet west down the track. Mr. Wise testified he was going about 5 miles per hour at the point of impact.

Mark Vick, another BNSF employee, was operating the second piece of on-track equipment behind Mr. Wise but did not see the collision. Mr. Vick testified all BNSF employees were required to be knowledgeable about the MOWOR and were tested annually on the rules. Mr. Vick testified the purpose of MOWOR 6.50.2 was that on-track maintenance equipment should slow down sufficiently so the equipment could yield the right-of-way to vehicular traffic at rail crossings. The on-track equipment operator would need to see if there was any vehicle traffic near the crossing to decide whether the equipment needed to stop. Mr. Vick testified MOWOR 6.50.2 applied to this crossing. Mr. Vick provided similar testimony regarding Eng. R. 14.4.1. That rule applied to all on-track machine operators and applied to a ballast regulator, according to Mr. Vick.

Randy Miller, the BNSF surface crew foreman on the date of the collision, testified MOWOR 6.50.2 had the purpose of protecting both BNSF employees and the public at crossings. He testified MOWOR 6.50.2 meant

---

[10]The ballast regulator nose, which consisted of a three part I-beam cross-piece, protruded approximately 18 to 20 feet out in front of the cab and was about three feet above the railroad tracks. <u>See</u> trial exhibits 104, 11-115, 114, 125, 135 & 220.

the BNSF on-track equipment operator was required to have visual confirmation of the crossing before proceeding through the area and if vehicular traffic was present, to stop the on-track equipment and yield the right-of-way to allow the public to proceed. That is how he was taught to interpret the rule and that was how Mr. Wise was taught to apply the rule. Mr. Miller testified Eng. R. 14.4.1 had the same purpose–to protect BNSF employees and the public.

Mr. Miller was asked by BNSF supervisor Nick Seiter to reenact the events leading up to the ballast regulator entering the crossing. Mr. Miller did so. He testified that while operating the ballast regulator at 10 miles per hour, as he approached the crossing there was good visibility some 60 feet to 70 feet to the north on the road traveled by Mr. Skrovig. Because Mr. Miller was prepared to stop, he was able to safely bring the ballast regulator to a complete stop before the front of the ballast regulator entered the crossing.

Mr. Miller testified that to stop the ballast regulator with a longer braking distance it was proper to use the propel lever, but to stop in a shorter distance the operator must use the brake lever. Mr. Miller testified that in his experience when a ballast regulator operator is confronted with a possible collision, the operator should use the brakes not the propel lever.

Another BNSF foreman, Steve Holm, testified that he, too, was trained and tested on MOWOR 6.50.2 and Eng. R. 14.4.1. Both rules were in place to keep BNSF employees, its equipment and the public safe. Both rules required an on-track operator to be prepared to stop and yield the right-of-way to vehicular traffic.

Nick Seiter, BNSF senior claims representative for South Dakota, testified he and Mr. Wise revisited the collision site the next day with the ballast regulator. Mr. Seiter never interviewed Mr. Wise about the collision. Mr. Seiter took no measurements of distances while the ballast regulator was operated in the direction of the crossing, but measured the ballast regulator operator's "eye height" at 8 feet 6 inches above ground level.[11] Mr. Seiter took several photographs of the ballast regulator moving westward on the rails but took no photographs along the operator's sight-line toward the north, the direction from which Mr. Skrovig approached the intersection the day before.

Mr. Seiter acknowledged that he and Tom Wilson, BNSF Director of Claims, met with Tami Skrovig three to five weeks after her husband's death. They discussed MOWOR 6.50.2 and the responsibility of BNSF at the crossing. Mr. Seiter does not recall either he or Mr. Wilson telling Ms.

---

[11]The height of the corn between the tracks and road was nearly 8 feet or slightly higher.

Skrovig that the BNSF employee "made a mistake" or that "BNSF wasn't clean" in the matter.[12] Mr. Seiter admits he told Ms. Skrovig the BNSF operator should have stopped and yielded the right-of-way to Mr. Skrovig's pickup. But at trial, Mr. Seiter retracted that statement and testified Mr. Skrovig should have stopped for the ballast regulator.

Minnehaha County Deputy Sheriff Gromer testified about his investigation the day of the collision. On the gravel road, Deputy Sheriff Gromer observed and marked with cones the path of travel taken by Mr. Skrovig's pickup before the collision. See trial exhibits 11-183, 11-191 & 11-196. He testified the pickup wheel track appeared to be an evasive maneuver and not a braking effort, as braking would have been in a straight line.

David Noyce, Ph.D in civil engineering, testified as one of plaintiff's expert witnesses. See trial exhibit 248. Dr. Noyce did not visit the collision site, but one of his associates, Mr. Marty, did and completed a survey, took photographs, and prepared a scale drawing. Dr. Noyce testified the photographs taken by Deputy Sheriff Gromer showed the road markings were not braking marks but were evidence of a turning wheel and evasive action on the part of Mr. Skrovig's pickup. Dr. Noyce concluded there was

---

[12]Mr. Seiter did not deny the statements occurred, he just did not recall those statements having been made. Mr. Wilson did not testify at trial.

insufficient evidence available from the collision data to reconstruct the speed of the pickup. However, he was able to apply a speed-to-weight ratio, that is, comparing the speed and weight of the ballast regular to the weight of the pickup to approximate the pickup's speed at impact. Dr. Noyce concluded there was a 3:1 speed-to-weight ratio between the vehicles. If Mr. Wise's testimony of his speed at impact is accepted, that is, the ballast regulator was at 5 miles per hour at the point of impact, then the speed of Mr. Skrovig's pickup at impact was 15 miles per hour.

Dr. Noyce testified Mr. Skrovig would not have been able to see the top of the ballast regulator above the corn and would not have expected to encounter a ballast regulator, which was much smaller in comparison to a train locomotive. Mr. Skrovig would not have been anticipating the appearance of the nose of the ballast regulator, which was much lower in profile and protruding approximately 20 feet in front of a piece of on-track equipment. Dr. Noyce testified there was no defining component about the size, lighting or dimensions of the ballast regulator which would alert a driver, such of Mr. Skrovig, of the on-track equipment's approach to the crossing.

Dr. Noyce concluded Mr. Wise was not operating the ballast regulator in a safe manner because of its unique configuration and speed as he

approached the crossing. He testified that had Mr. Wise followed BNSF internal rules, the collision would not have occurred.

Mark Edwards, Ph.D. in human factors engineering, also testified for plaintiff. See trial exhibit #249. Dr. Edwards testified the principal activity of a motor vehicle operator is "lane keeping." That is, the driver will make brief scanning motions to view the area of the road and both side areas. A driver's expectation of what could or may be ahead is important to a driver's response time. Because the ballast regulator is significantly smaller than a locomotive, a component of the ballast regulator, the nose 20 feet ahead of the cab would be unexpected. As a result, Dr. Noyce testified Mr. Skrovig's response time would double over normal reaction time. When Mr. Skrovig would have first seen the nose of the ballast regulator at the edge of the roadway, the speed of the ballast regulator would not have given Mr. Skrovig sufficient time to avoid a collision.

Tami Skrovig testified extensively about her husband's health, lifestyle and relationship with her, their children and their community. She also testified about the meeting she had with Mr. Wilson and Mr. Seiter. Ms. Skrovig testified that during the meeting these BNSF employees acknowledged BNSF was at fault in the collision and was "not clean" on this matter. They admitted the ballast regulator should have been prepared to stop but had not stopped.

The court concludes there is a "legally sufficient evidentiary basis to find for [plaintiff] . . . ." Fed. R. Civ. P. 50(a). The court arrives at this conclusion without engaging in "a weighing or evaluation of the evidence," judging the credibility of the witnesses, and by "giv[ing] great deference to the jury's verdict." Howard, 615 F.3d at 995.

Defendant's motion for judgment as a matter of law is denied.

## B.    MOTION FOR NEW TRIAL

A motion for new trial is governed by Fed. R. Civ. P. 59. "The court may, on motion, grant a new trial on all or some issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted . . . ." Rule 59(a)(1)(A). When compared to a motion for judgment as a matter of law, "[t]he standard for granting a motion for new trial is higher still." Howard, 615 F.3d at 995. "Under Rule 59, the decision to grant a new trial lies within the sound discretion of the trial court, and its decision will not be reversed on appeal absent a clear abuse of that discretion." Id. "Where the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." Id. (internal quotation marks and citations omitted). "In such circumstances, the court should only grant a new trial to avoid a miscarriage of justice." Id. See also Structural Polymer Group, Ltd., 543 F.3d at 991 ("A new trial motion premised on a dispute about the

strength of the supporting proof should be granted only if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice.") (citation and internal quotation marks omitted). Unlike a motion for judgment as a matter of law, in evaluating a motion for a new trial the court "can rely on its own reading of the evidence–it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992) (citation and internal quotation marks omitted).

A trial court's denial of a motion for new trial is reviewed for an abuse of discretion. United States v. Burrage, 687 F.3d 1015, 1019 (8th Cir. 2012). "Reversal of a denial of a motion for new trial is rare." Id. (citations omitted). "Under Rule 59, the decision to grant a new trial lies within the sound discretion of the trial court, and its decision will not be reversed on appeal absent a clear abuse of that discretion." Der v. Connolly, 666 F.3d 1120, 1126 (8th Cir. 2012) (internal citation and quotation omitted).

The court's formulation of jury instructions is reviewed for an abuse of discretion. Id. "The trial court has broad discretion in the form and language used in instructions to the jury." Fink v. Foley-Belsaw Co., 983 F.2d 111, 113 (8th Cir. 1993) (citing Bissett v. Burlington N. R.R. Co., 969 F.2d 727, 729 (8th Cir. 1992) (citation omitted)). Jury instructions must be

reviewed "to determine whether, taken as a whole, they are confusing or misleading in presenting the applicable principles of law." Id. (internal citation omitted). "The particulars of the instructions are largely within the discretion of the trial judge." Hrzenak v. White-Westinghouse Appliance Co., 682 F.2d 714, 720 (8th Cir. 1982). The court's jury instructions "do not need to be technically perfect or even a model of clarity." Der, 666 F.3d at 1126 (internal citation omitted). Even if the trial court erroneously instructs a jury, that error is not reversible error unless it "affects the substantial rights of the parties." Id. (internal quotation and citation omitted).

Defendant's motion for new trial argument consists of the several claims summarized as:

1. Because of an erroneous ruling by the court, plaintiff was allowed to "pile on evidence of BNSF's alleged failure to warn of the approach of the ballast regulator. . . . ["flagging claim"]. (Docket 212 at p. 16);

2. Once the court decided the flagging claim evidence should not have been presented to the jury, the court "should have granted a mistrial." Id. at p. 18;

3. The court's withdrawal instruction regarding the flagging claim was "inadequate to cure the errors." Id. at p. 19;

4. The court erred in denying defendant's motion *in limine* to exclude Dr. Ralph Brown's expert testimony. Id.;

5.  The court "erred in allowing, over BNSF's objection, evidence of blood testing of the ballast operator, Dwight Wise." Id.;

6.  The final jury instructions were erroneous and highly prejudicial. Id. at p. 20; and

7.  The jury verdict and damages awarded were against the greater weight of the evidence. Id. at p. 23.

Each of these claims is separately addressed.

## 1. THE "FLAGGING CLAIM"

Defendant objects that "[p]laintiff was repeatedly allowed to offer evidence of, refer to and argue about MOWOR 6.50.2 and Eng. R. 14.4.1. as well as reference generally BNSF's practice of 'flagging', 'warning' about the approach of the ballast regulator, and the purpose of flagging, the 'railroad's responsibility at the crossing . . . .' " (Docket 212 at p. 17).  During plaintiff's case-in-chief, defendant's employees were questioned about the purpose and impact of portions of BNSF internal rules which included language concerning the flagging claim.

MOWOR 6.50.2 in its complete form contained the following language: "If necessary, flag the crossing to protect movement of on-track equipment." Trial exhibit 6.  Eng. R. 14.4.1 contained the following language: "When traffic conditions could be hazardous, use a flagger to protect movement over the crossing."  Trial exhibit 9.  Each of defendant's employees and former employees was asked a variation of the same question regarding

these two provisions–Is flagging an option for BNSF when a piece of on-track equipment approaches an intersection?

During the motion for judgment as a matter of law hearing at the close of plaintiff's case-in-chief, the court revisited the federal preemption issue. The court concluded the flagging claim was "preempted as a claim that constitutes an argument that there should have been an active signal or warning at the crossing . . . ." (Docket 204 at p. 33). The court then granted BNSF's motion for judgment as a matter of law as to the flagging claim and ordered trial exhibits 6 & 9 redacted to remove the flagging language. Id. at p. 46. For the same reason, Ms. Skrovig's notes of her meeting with Mr. Seiter and Mr. Wilson were redacted. The redacted forms of BNSF internal rules became trial exhibits 6A & 9A and Ms. Skrovig's notes became trial exhibit 247A.

Defendant argues the flagging claim was "a pivotal issue" at trial. (Docket 212 at p. 17). The flagging claim was neither the sole issue nor, by the amount of time or emphasis spent on the issue with the trial witnesses, the most important evidentiary issue or claim presented to the jury. The flagging claim was not "a pivotal issue" at trial. "A new trial on the basis of evidentiary errors is warranted only when those errors were so prejudicial that a new trial, absent the errors, 'would be likely to produce a different result.' " Ladd v. Pickering, 783 F. Supp. 2d 1079, 1086 (E.D. Mo. 2011)

(citing <u>Pointer v. DART</u>, 417 F.3d 819, 822 (8th Cir. 2005) (citation omitted) and Fed. R. Evid. 103(a) (erroneous evidentiary ruling must affect a substantial right of the party)).

While each of defendant's employees was questioned about the flagging claim, a far greater amount of time and emphasis in the evidence and testimony was the conduct of Mr. Wise, his operation and control of the ballast regulator, and whether he had an obligation to yield the right-of-way at the crossing. Contrary to defendant's argument, the admissions to Ms. Skrovig by Mr. Seiter and Mr. Wilson that BNSF "was not clean" and was "at fault" for the collision were in a far greater sense admissions that Mr. Wise failed to yield the right-of-way.[13] The court finds the removal of the flagging claim evidence would not have produced a different result. <u>Ladd</u>, <u>supra</u>. The vast majority of the evidence associated with the flagging claim was also relevant to plaintiff's failure to yield the right-of-way claim.

Defendant's motion for new trial on this ground is denied.

**2. THE MISTRIAL MOTION**

When the court granted defendant's motion for judgment as a matter of law as to plaintiff's flagging claim, BNSF then moved for a mistrial based upon the flagging claim evidence. "A trial court enjoys wide discretion in

---

[13]<u>See</u> the earlier summaries of BNSF employees' testimony in this order.

ruling on a motion for a mistrial, and will not be reversed absent a manifest abuse of that discretion." Underwood v. Colonial Penn Insurance Co., 888 F.2d 588, 590 (8th Cir. 1989) (citation omitted). "A mistrial is a drastic remedy and ought not to be resorted to unless there has been an error so prejudicial that justice could not be served by continuing in the trial and there is no other method by which the prejudice can be removed." Id. (citation omitted). "Because the mistrial motion was premised on the district court's admission of evidence, [defendant] bears an unusually heavy . . . a double burden of showing abuse of discretion, both as to the admission of evidence and as to the denial of the mistrial." Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 39 (1st Cir. 2002).

"Jurors are presumed to follow the instructions on the law as given to them . . . they will do it and they will do it in good faith and . . . will not consider evidence bearing on a claim which was removed from their consideration." (Docket 204 at p. 46). A mistrial was not appropriate as the court found use of the claim withdrawal instruction was a less drastic remedy and a proper method for removing any potential prejudice caused by the admission of the flagging claim evidence. Underwood, supra.

Defendant's motion for a new trial on this ground is denied.

### 3. THE WITHDRAWAL INSTRUCTION

After concluding the flagging claim should be removed from consideration by the jury, the court gave a withdrawal instruction to the jury before the start of defendant's case. That trial instruction stated:

> Plaintiff's claim that Defendant failed to properly flag the crossing before the ballast regulator entered the crossing is no longer part of this case. So you will not decide that claim. You should not concern yourselves why this claim is not part of the case. You should decide the case based solely on the evidence on the remaining claims before you.

(Docket 204 at p. 49). The withdrawal instruction was also given as one of the final instructions to the jury. <u>See</u> Docket 189 at p. 35.

The court's proposed withdrawal instruction was provided to counsel for their review before it was read to the jury. (Docket 204 at p. 34). To preserve its mistrial motion, BNSF objected to giving the withdrawal instruction. <u>Id.</u> at p. 36. Through discussion with plaintiff's counsel the withdrawal instruction was modified. <u>Id.</u> at pp. 36-38. While preserving its mistrial motion, BNSF argued the last two sentences of the proposed instruction were confusing. <u>Id.</u> at p. 28. BNSF proposed the court's trial instruction, after the first sentence, be limited to the following: "You should not concern yourself with why the claim is no longer part of this case. . . . You should decide . . . this case based solely on the remaining claims and the evidence before you." <u>Id.</u> at p. 39. The court adopted BNSF's suggestion and modified the instruction. BNSF then again objected to the withdrawal

instruction as modified.  Id.  Defendant's objection was overruled.  The withdrawal instruction was given as stated above.

BNSF now argues the withdrawal instruction "was inadequate to cure the errors." (Docket 212 at p. 19).  Although it objected to the language ultimately used in the withdrawal instruction, BNSF made no further effort to resolve any claimed inadequacy or ambiguity in the instruction.  Fed. R. Civ. P. 51 requires a party to "file and furnish to every other party written requests for the jury instructions it wants the court to give." Rule 51(a)(1). Where there is an objection, the "party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  Rule 51(c)(1). "Appellate courts are not inclined to grant a new trial because of an ambiguity in an instruction when it appears that the complaining party made no effort at the trial to have the matter explained." Roth v. Black & Decker, U.S., Inc., 737 F.2d 779, 783 (8th Cir. 1984) (internal quotation marks and citation omitted).  To simply continue to object without offering additional proposed curative language, defendant's post-trial objection is inadequate.

"It is presumed that a jury will follow a curative instruction unless there is 'an overwhelming probability' that it was unable to do so." United States v. Uphoff, 232 F.3d 624, 626 (8th Cir. 2000) (referencing Greer v.

Miller, 483 U.S. 756, 766 n. 8 (1987)). "[T]here is nothing to suggest that the curative instruction was not followed by the jury . . . ." Id.

Defendant's motion for new trial on this ground is denied.

### 4. DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE DR. RALPH BROWN'S EXPERT TESTIMONY

Defendant's post-trial motion argues the court "erred in allowing the opinion testimony of plaintiff's expert witness, economist Dr. Ralph Brown and for not granting in part or in whole Defendant's Motion in Limine . . . for each and all of the reasons set forth in said Motion." (Docket 212 at p. 19). Defendant's pretrial motion *in limine* concerning Dr. Brown (Docket 127) was denied. (Docket 167 at p. 8). The issue was fully briefed by the parties prior to the court's ruling. See Dockets 127 & 140.

Defendant argued Dr. Brown's testimony should have been excluded because the opinion testimony was based on unreliable and inappropriate assumptions. Defendant claimed Dr. Brown's opinions reflected the employment of a methodology of calculating the claimed loss to the Estate that was contrary to controlling South Dakota law and the applicable federal rules and precedents on the admissibility of expert testimony. (Docket 127 at p. 1). It was defendant's position Dr. Brown applied an inappropriate standard for calculating loss known as an "opportunity cost" approach. Id. at p. 2. Defendant submits this calculation stems from a misguided and erroneous interpretation of South Dakota law that in a wrongful death

35

action a proper measure of loss to the estate is the deceased's "lost earning capacity." Id.

Defendant objected to Dr. Brown's use of Mr. Skrovig's "lost earning capacity" and not his future income, based on past income as reported in his tax returns from self-employment as a general contractor. Id. Defendant also objected to Dr. Brown's use of Byre v. Wieczorek, 217 N.W.2d 151 (S.D. 1974) in support of his conclusion that an expert is not allowed to "estimate the loss of earning capacity by use of business tax returns when the business involves inventory, depreciation, capital and so forth." (Docket 127 at p. 4) (citing Dr. Brown's deposition 18:13-25). Defendant argued this allows a "grossly over-inflated 'value' to projected losses to the Estate and by using future lost 'earning capacity,' Dr. Brown does not properly adjust and thereby discount any projected losses by considering participation rates or potential unemployment of the deceased during his future work life." Id. at p. 5 (citing Dr. Brown's deposition 25:1-27:7).

Rather than citing South Dakota Supreme Court cases involving Dr. Brown's prior economic loss testimony, BNSF chose to argue that an Iowa district county court case was the applicable authority supporting defendant's argument. (Docket 128 at pp. 16-19). Defendant's reliance on the Iowa state court decision is not useful in a South Dakota wrongful death

case.  Dr. Brown's economic loss reports have been allowed in <u>Stormo v. Strong</u>, 469 N.W.2d 816, 821 (S.D. 1991), a personal injury case; <u>Small v. McKennan Hospital</u>, 437 N.W.2d 194 (S.D. 1989), a wrongful death case; <u>Martino v. Park Jefferson Racing Association</u>, 315 N.W.2d 309, 312 (S.D. 1982), a personal injury case; <u>Flagtwet v. Smith</u>, 367 N.W.2d 188 (S.D. 1985), a wrongful death case.  Those cases cite the previous cases in which Dr. Brown testified and also reference the 1974 South Dakota Supreme Court case of <u>Byre</u>, which Dr. Brown specifically referenced in explaining the economic analysis conducted in this case.  "The purpose of an award of damages for loss of future earnings is 'to compensate for loss of earning capacity as distinguished from loss of actual earnings . . . ." <u>Byre</u>, 217 N.W.2d at 155 (internal citation omitted).

"Once it has been established that there is an adequate basis for an expert's testimony, it is then up to the trier of fact to determine the weight to be given to the expert's opinion and whether to award damages for loss of future earning capacity." <u>Stormo</u>, 469 N.W.2d at 821 (citing <u>Martino</u>, 315 N.W.2d at 312).  "It is the jury's province to weigh the credibility of witnesses and the evidence presented at trial, . . . and the factual basis of an expert's testimony generally goes to the credibility of the testimony, not admissibility, and that the party opposing the testimony can attack the factual basis on cross-examination." <u>Waitek v. Dalkon Shield Claimants Trust</u>, 934 F. Supp. 1068, 1090 (N.D. Iowa 1996) <u>aff'd</u>, 114 F.3d 117 (8th Cir. 1997) (citing <u>White</u>, 961 F.2d at 779) (additional citation omitted).

Defendant advances no new argument or reference to the trial record which would support the conclusion the court erred in its original ruling. Dr. Brown's testimony was consistent with South Dakota law on the subject and his opinions were challenged by defendant's cross-examination. Waitek, supra.

Defendant's motion for new trial on this ground is denied.

## 5. EVIDENCE OF BLOOD TESTING

By its pretrial order, the court granted defendant's motion *in limine* prohibiting plaintiff's counsel from making any reference to or introducing evidence regarding a BNSF employee's alcohol testing. (Docket 167 at p. 3, ¶ 6). During the course of the testimony of Minnehaha County Deputy Sheriff Burns, plaintiff's counsel asked why Mr. Wise was in the officer's patrol car. In response, the witness testified it was standard procedure that anytime a death occurred a blood test was taken of the other person involved in the accident. BNSF immediately objected to the question and answer. During the colloquy with counsel at the bench, the court offered to disclose to the jury that Mr. Wise's blood alcohol content was 0.000%, but BNSF objected to that disclosure.[14] The court found plaintiff's counsel's question was not based on an improper motive. See also Docket 204 at p. 46 ("Mr. Evans's question to a law enforcement officer concerning the reason

---

[14]The jury was not permitted to see the affidavit of Jessica E. Lichty redacted from plaintiff's original exhibit 11. The affidavit was identified in discovery as DEF 000113. The affidavit of forensic chemist Lichty contained the finding that Mr. Wise's blood alcohol content was 0.000%.

that Mr. Wise was put in a patrol vehicle, I denied a motion for mistrial at the bench when that occurred. I don't find any improper motive . . . ."). The court sustained the objection, denied BNSF's mistrial motion, instructed the jury to disregard the question and answer, and specifically instructed the jury that alcohol consumption or use was not an issue in the case.

The question asked by Mr. Evans elicited testimony in violation of the order *in limine*, but "the court's prompt actions to cure the prejudicial effects" was the proper remedy. United States v.Whitney, 787 F.2d 457, 461 (8th Cir. 1986); see also Black v. Shultz, 530 F.3d 702, 707 (8th Cir. 2008) ("The district court's instruction was given immediately after the violation. It explained clearly and thoroughly why the testimony was irrelevant and why the jury was to disregard it. . . . Defendant[] fail[s] to explain how [it was] prejudiced or denied a fair trial by [the] testimony . . . .").

Defendant's motion for new trial on this ground is denied.[15]

---

[15]BNSF also argues other comments by plaintiff's counsel violated the court's orders *in limine.* (Docket 212 at pp. 19-20). Any questionable comments by plaintiff's counsel which were objected to during the course of trial were dealt with through immediate rulings by the court and, where appropriate, the jury was instructed accordingly. "Whether errors had a significant prejudicial influence on the jury in a particular case . . . is a . . . question of judgment . . . . In appraising prejudicial remarks and conduct . . . .the court must consider the climate of the contest in which it occurred." Sanders-El v. Wencewicz, 987 F.2d 483, 485 (8th Cir. 1993) (internal quotation marks and citations omitted). The court finds conduct of counsel, whether in conducting voir dire, examining witnesses, or during closing argument, if objected to by BNSF, did not have an influence on the jury's verdict.

## 6. THE FINAL JURY INSTRUCTIONS

"The trial court has broad discretion in the form and language used in instructions to the jury." <u>Fink</u>, 983 F.2d at 113 (citation omitted). Jury instructions must be reviewed "to determine whether, taken as a whole, they are confusing or misleading in presenting the applicable principles of law." <u>Id.</u> (internal citation omitted). "The particulars of the instructions are largely within the discretion of the trial judge." <u>Hrzenak</u>, 682 F.2d at 720. The final jury instructions "do not need to be technically perfect or even a model of clarity." <u>Der</u>, 666 F.3d at 1126 (internal citation omitted). Even if the trial court erroneously instructs a jury, that error is not reversible error unless it "affects the substantial rights of the parties." <u>Id.</u> (internal quotation and citation omitted).

Defendant argues that "[f]or the reasons stated on the record [during] . . . [the] jury instruction conference, the final instructions given by the Court were erroneous and the errors were not harmless." (Docket 212 at p. 21). Most prominent in defendant's argument were the court's withdrawal instruction, the standard of care instruction, and the BNSF internal rules instructions. (Docket 189 at pp. 18-20 & 35). The court's decision and rationale regarding these particular instructions is set forth earlier in this order and need not be repeated here. The remainder of defendant's

proposed instructions which were refused by the court during the jury instruction conference will be addressed separately.

A. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 19–COMPARATIVE NEGLIGENCE–ISSUES IN THE CASE

Defendant's proposed instruction included the affirmative defense of assumption of the risk. (Docket 130 at p. 31). BNSF withdrew the assumption of the risk affirmative defense. Because of that decision, BNSF agreed the assumption of the risk language should be removed from all of the final instructions. (Docket 204 at pp. 54-56). The remainder of defendant's proposed instruction number 19 was integrated into final instruction number 30. (Docket 189 at p. 36). Defendant fails to identify why the court's final instruction was not a proper statement of the law. Fed. R. Civ. P. 51(c)(1).

B. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 23–COMPARATIVE NEGLIGENCE–EXTENT OF NEGLIGENCE OF PLAINTIFF AND DEFENDANT

Defendant claims the court erred in not using defendant's proposed instruction. (Docket 130 at p. 37). Proposed instruction number 23 was incorporated into final instruction number 18. (Docket 189 at pp. 22-23). The language of both instructions is virtually identical. Defendant fails to identify why the court's final instruction was not a proper statement of the law.

### C.  DEFENDANT'S PROPOSED INSTRUCTION NUMBER 30–PROPER LOOKOUT–CONTROL OF VEHICLE

Defendant's proposed instruction is a general rule of the road instruction.  (Docket 130 at p. 44).  The court chose to "use[] the more specific South Dakota instruction regarding railway grade crossings as opposed to a general lookout instruction applicable to uses [of] a public highway."  (Docket 204 at p. 114).  "A party is entitled to a legally correct instruction that is supported by the evidence, but there is no entitlement to any particular language in an instruction."  May v. Arkansas Forestry Commission, 993 F.2d 632, 637 (8th Cir. 1993).  Final instructions number 20–duty of driver using highway, number 21–effect of crossbuck signs, and number 22–approaching a railroad grade crossing are correct statements of the law.  Defendant's proposed instruction adds no further clarification to the duty of a motor vehicle operator approaching a railway grade crossing.  "[C]arefully tailored, specific instructions . . . would have been more helpful to the jury in resolving the issues before it than [a general instruction]. . . ."  Great W. Sugar Co. v. Mrs. Alison's Cookie Co., Inc., 749 F.2d 516, 523 (8th Cir. 1984).  The court's final instructions satisfy this mandate and defendant fails to articulate why the court's final instructions are not a proper statement of the law.

### D. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 31–ASSUMPTION–OBEYING LAWS

This proposed instruction is also a general rule of the road instruction. (Docket 130 at p. 45). Like defendant's proposed instruction number 30, the court chose to "use[] the more specific South Dakota statutes regarding a motor vehicle operator approaching a railroad grade crossing." (Docket 204 at p. 115). Proposed instruction number 31 is not complete when compared to the final instructions given by the court. "[T]aken as a whole, the jury instructions given by the district court fairly and accurately presented the applicable law." Overholt Crop Insurance Service Co. v. Travis, 941 F.2d 1361, 1369 (8th Cir. 1991).

### E. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 32–DRIVER'S DUTY TO DRIVE AT A REASONABLE SPEED UNDER THE CONDITIONS THEN EXISTING

While defendant's proposed instruction number 32 is a proper statement of SDCL § 32-25-3, it is a general highway use instruction and not specifically focused on the duty of a driver approaching a railroad grade crossing. (Docket 130 at p. 46). For the same reasons defendant's other proposed general instructions were refused, the court chose to instruct the jury on the law specifically applicable to railroad grade crossings. Great W. Sugar Co., supra.

F. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 36–MOTORIST'S HEIGHTENED DUTY TO LOOK AND LISTEN AT AN OBSTRUCTED RAILROAD CROSSING

This proposed instruction (Docket 130 at p. 50) is "a general rule based on common law." (Docket 204 at p. 116). The court chose to use "the more specific statutory obligations . . . set out in what was before we renumbered, 24, 25 and 26 of the Court's Proposed Final Instructions [final instructions numbered 21, 22, & 23]." Id. See also Docket 189 at pp. 26-28. Great W. Sugar Co., supra.

G. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 37–MOTORIST'S HEIGHTENED DUTY OF CARE AT AN OBSTRUCTED RAILROAD CROSSING

This proposed instruction is a general statement of law. (Docket 130 at p. 51). It is not as specific as the court's final instructions numbered 21, 22, & 23. (Docket 204 at 116). In addition, defendant's proposed instruction number 37 is not a correct statement of South Dakota law. The phrase "and allow it to pass" as proposed in the instruction is not included in the holdings of the cases cited as authority in defendant's proposed instruction. (Docket 130 at p. 51). The court's specific instructions properly explained South Dakota law. Great W. Sugar Co., supra.

H. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 38–PRESUMPTION THAT MOTORIST DID NOT LOOK

This proposed instruction is a common law based instruction. (Docket 130 at p. 52). It is not as specific as the court's final instructions

44

numbered 21, 22, & 23. (Docket 204 at 116). The case cited as defendant's authority for this proposed instruction, <u>Schuknecht v. Chicago, M., St. P. & P. R. Co.</u>, 48 N.W.2d 917, 924-25 (S.D. 1951), did not use the language proposed by defendant or create the presumption which defendant proposed. The court's instructions properly explained South Dakota law. <u>Great W. Sugar Co.</u>, <u>supra</u>.

I. DEFENDANT'S PROPOSED INSTRUCTION NUMBER
   40–RAILROAD TRACKS WARN OF DANGER

This proposed instruction is a common law based instruction. (Docket 130 at p. 54). It is not as specific as the court's final instructions numbered 21, 22, & 23. (Docket 204 at 116). The court's instructions properly explained South Dakota law. <u>Great W. Sugar Co.</u>, <u>supra</u>.

J. DEFENDANT'S PROPOSED INSTRUCTION NUMBER
   41–BREACH OF RAILROAD'S DUTY DOES NOT
   EXCUSE NEGLIGENCE

Defendant claims the court erred by failing to give proposed instruction number 41. (Docket 212 at pp. 22-23). However, this instruction was not one of the proposed instructions BNSF wanted the court to consider during the jury instruction conference. <u>See</u> Docket 204 at pp. 114 & 117-18. Failure to include this proposed instruction violates the requirements of Fed. R. Civ. P. 51(a). "In order to properly preserve a claim of instructional error . . . a party is not only required to make a sufficiently precise objection before the district court, but it must also propose an

45

alternate instruction." <u>Caviness v. Nucor-Yamato Steel Co.</u>, 105 F.3d 1216,

1220 (8th Cir. 1997) (internal quotation marks and citation omitted).

Defendant failed to bring this proposed instruction to the court's

attention during the jury instruction conference and the issue is waived. <u>Id.</u>

K.  DEFENDANT'S PROPOSED INSTRUCTION NUMBER
    47–PRESENT VALUE

Defendant proposed the court give the present value instruction

which is included among the pattern jury instructions in South Dakota.[16]

(Docket 130 at pp. 62-63).  The court found this pattern jury instruction to

be "an extraordinarily confusing South Dakota Pattern Jury Instruction

. . . ." (Docket 204 at p. 117).  Because of the potential for jury confusion,

the court refused to give the instruction. <u>Id.</u>

In South Dakota, there is no requirement that a present value

instruction must be given.  Rather, the South Dakota Supreme Court

adopted "the  practice of *either* providing the jury with instructions

including tables or some other helpful means to reduce to present value, or

providing an expert to reduce the damages for the jury." <u>Howard v.</u>

<u>Sanborn</u>, 483 N.W.2d 796, 802 (S.D. 1992) (emphasis in original).

---

[16]Defendant mistakenly identified its present value instruction as
proposed instruction number 59.  (Docket 212 at p. 23).  It was submitted as
proposed instruction number 47.  (Docket 130 at p. 62).

Plaintiff's economic loss expert witness, Dr. Brown, specifically testified regarding the process he used to reduce the future loss of earning capacity of Thomas Skrovig to a present value. Dr. Brown placed this present value in a range of dollars allowing the jury to decide which work life expectancy for Mr. Skrovig, if any, it chose to use. See trial exhibit 314. Defendant offered no expert witness to contradict Dr. Brown's conclusions. Dr. Brown's testimony satisfied the requirements of Howard and made a present value instruction unnecessary.

L.   DEFENDANT'S PROPOSED INSTRUCTION NUMBER 39–EFFECT OF CROSSBUCK SIGNS

Defendant argues "the Court erred in failing to give BNSF's proposed instruction No. 39 . . . which would have clarified the ambiguity in given instruction No. 21." (Docket 212 at p. 23). Final instruction number 21–effect of crossbucks signs (Docket 189 at p. 26) generated a lively discussion during the jury instruction conference. See Docket 204 at pp. 77-86. During the conference this instruction was the court's proposed instruction number 24. Id. at p. 77. BNSF wanted the court to include the language "and requires a motorist to yield to the railroad traffic." Id. at p. 78. See also Docket 130 at p. 53. Defendant wanted the instruction to require a motorist, such as Mr. Skrovig, to yield to "railroad traffic," which would include the ballast regulator. (Docket 204 at pp. 79-81). The statutory authority for defendant's proposed instruction is SDCL § 49-16A-

47

87. (Docket 130 at p. 53). That section, in pertinent part, provides: "a sign with large and distinct letters giving notice of the proximity of the road and warning persons of the necessity for looking out for <u>trains</u>." <u>Id.</u> (emphasis added).

The court concluded the language of final instruction number 21 is a correct statement of South Dakota law. It also "avoid[s] unnecessary confusion to the jury in defining what a train is and isn't, which we haven't really embraced here by any witness because we're dealing with a ballast regulator . . . ." (Docket 204 at p. 82). The court recognized that "once [the court] start[s] trying to conform statutory language to the issues in the case . . . the possibility of either misleading the jury or creating error is increased." <u>Id.</u> at p. 84. Final instruction number 21 is a correct statement of the law in South Dakota and incorporates the language from "the South Dakota Driver's Manual [which] also refers to trains." <u>Id.</u> The court incorporated into the instruction the following sentence: "A crossbuck sign has the same meaning as a yield sign." (Docket 189 at p. 26). BNSF was "entitled to a legally correct instruction that is supported by the evidence, but there is no entitlement to any particular language in an instruction." <u>May</u>, 993 F.2d at 637.

## M. DEFENDANT'S PROPOSED INSTRUCTION NUMBER 11–GENERAL INSTRUCTION-NATURE OF CASE

Defendant proposed what can only be described as a "kitchen sink" instruction. (Docket 130 at p. 22). In addition to identifying thirteen claims of contributory negligence and assumption of the risk (which defendant agreed was no longer part of the case), the proposed instruction identified six legal grounds by which plaintiff's claims were preempted under federal law. Id. The proposed instruction included a claim that Mr. Skrovig was negligent for "using or otherwise attending to a cell phone. . . ." Id. at ¶ 2(e). There was no evidence presented to the jury regarding Mr. Skrovig's cell phone or his alleged use or diverted attention relating to his cell phone.

The court incorporated some parts of defendant's proposed instruction number 11 into the court's final instructions to the jury. See Docket 189 at pp. 15, 25-28). Defendant fails to identify which refused parts of its proposed instruction constituted prejudice to its defense. Der, 666 F.3d at 1126 (failure to use defendant's proposed instruction is not error unless it "affects the substantial rights of the parties.").

Defendant's motion for new trial on this ground is denied.

### 7. THE VERDICT AND DAMAGES AWARD WERE AGAINST THE WEIGHT OF THE EVIDENCE

BNSF argues "the verdict for plaintiff is against the clear weight of the evidence showing that plaintiff's claims are preempted and that Mr. Skrovig,

was negligent in a degree that was more than slight in comparison with the alleged negligence of defendant." (Docket 212 at p. 24). Defendant's preemption claims are disposed of earlier in this order and need not be restated here.

"[T]he true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not." White, 961 F.2d at 780 (internal quotation marks omitted). "[T]he district court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. . . . [T]he trial judge may not usurp the functions of a jury ... [which] weighs the evidence and credibility of witnesses." Id. at 780-81 (internal quotation marks and citations omitted).

The court finds the jurors' unanimous interpretation of the evidence was appropriate. The clear weight of the evidence was not in opposition to the jury's verdict, but rather, supported its verdict. The jury was properly instructed on the issues of contributory negligence and comparative negligence. (Docket 189 at p. 22). Based on the evidence presented at trial, it was logical, rational, and within the preview of its duties for the jury to

conclude that Mr. Skrovig was not negligent or contributorily negligent greater than slight in comparison to the negligence of Mr. Wise, BNSF's employee. Based on the testimony, Mr. Skrovig's speed as he approached the railroad crossing may very well have been 15 miles per hour or less. (Docket 189 at p. 28). The jury chose to accept the testimony of plaintiff's experts, Dr. Noyce and Dr. Edwards, and discount the testimony of defendant's expert, Mr. Scott. Weighing and judging the credibility of expert witnesses is a trial function reserved to the jury. Id. at p. 12. The court finds the jury's verdict as to the question of liability was a proper one and no miscarriage of justice occurred. White, 961 F.2d at 780.

BNSF also argues "the award of damages was excessive and not based on the evidence." (Docket 212 at p. 24). The defendant also claims the verdict "was excessive in light of the uncontroverted evidence that plaintiff as personal representative of the Estate . . . failed to mitigate her alleged damages . . . ." Id.

During trial, defense counsel cross-examined Tami Skrovig about Skrovig Construction. Ms. Skrovig explained in detail the fact that her husband was the heart and soul of the business. While the young men who worked for Mr. Skrovig were good employees, she did not have confidence in their ability to take over leadership of the company. Jon Randby and Jason Egger both testified they enjoyed working with Mr. Skrovig but would have

needed higher wages to give continuation of the business a chance to succeed. They testified Mr. Skrovig was the reason Skrovig Construction was successful. Ms. Skrovig testified she was not comfortable investing money in Skrovig Construction on the outside chance either Jon or Jason could keep the business afloat and its excellent reputation intact. For these reasons, as well as Ms. Skrovig working full-time in Sioux Falls without time to be involved in Skrovig Construction, Ms. Skrovig chose to close down the business.

The jury was properly instructed on defendant's mitigation of damages defense. (Docket 180 at p. 34). Whether to accept defendant's argument, unsupported by any financial or expert evidence, or to accept Ms. Skrovig's explanation for closing Skrovig Construction was an issue for the jury to resolve. "Problems presented by conflicting evidence or depending upon credibility of witnesses and weight of the evidence are to be decided by the jury and not by . . . the trial court." <u>Traders & General Insurance Co. v. Powell</u>, 177 F.2d 660, 663 (8th Cir. 1949). "It is well settled that issues which depend upon the credibility of witnesses and the weight of evidence are to be decided by the jury; that an issue which is uncertain because of a conflict in the evidence or because fair-minded men will honestly draw different conclusions from the undisputed facts, is one of fact for the jury; and that it is only where the evidence upon any issue is all on one side or so

overwhelmingly on one side as to leave no doubt what the fact is, that the issue becomes one of law for the court." <u>Milprint, Inc. v. Donaldson Chocolate Co.</u>, 222 F.2d 898, 901-02 (8th Cir. 1955). The court finds there was substantial evidence to support the jury's decision to accept plaintiff's evidence and reject defendant's failure to mitigate damages argument.

Regarding defendant's claim that the jury's damage award was excessive, the court begins by noting Dr. Brown's testimony placed the economic loss to the Estate of Thomas Skrovig at between $947,715 and $1,306,948. Trial exhibit 314. The court observed during trial that all of plaintiff's damages witnesses–Mr. Randby, Mr. Egger, Ms. Anderson (Mr. Skrovig's sister), Mr. Limmer (Ms. Skrovig's brother), Jeffrey Skrovig, Renae (Skrovig) Jensen, Brian Skrovig and Tami Skrovig–provided vivid, articulate and convincing testimony about Mr. Skrovig's positive impact on his children's development, education and maturity, as well as about his strong relationship with Tami, both in the community and in their home life. The uncontroverted and unchallenged testimony disclosed a close-knit, loving family, with Mr. Skrovig in the center providing aid, comfort and society to his wife and children.[17]

---

[17]In the motion for new trial analysis, the court finds plaintiff's damages witnesses personable, honest and credible. <u>White</u>, 961 F.3d at p. 780.

In South Dakota, there is "no standard by which to judge the reasonableness of a verdict . . . ." <u>Weidner v. Lineback</u>, 140 N.W.2d 597, 603 (S.D. 1966).  Rather, judging a verdict for excessiveness is left to the judgment of the trial court.  "As a participant in the original proceedings the trial court is best qualified to accurately judge the forces that shaped the verdict of the jury and can most readily sense the influence of passion and prejudice in an excessive verdict." <u>Id.</u>  <u>See also</u> <u>Kusser v. Feller</u>, 453 N.W.2d 619, 621 (S.D. 1990) ("The trial court is best able to judge whether the damages awarded by a jury are the product of passion or prejudice.").

To determine whether damages are reasonable or excessive so as to warrant a new trial the court must consider this principle:

> The damages . . . must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such a manifestly show [sic] the jury to have been actuated by passion, partiality, prejudice or corruption . . . [that is] the verdict is so excessive or unreasonable as to require a new trial.

<u>Weidner</u>, 140 N.W.2d at 603 (internal quotation marks and citation omitted).  "If the jury's verdict can be explained with reference to the evidence, it should be affirmed." <u>Reinfeld v. Hutcheson</u>, 783 N.W.2d 284, 287 (S.D. 2010) (internal quotation marks and citation omitted).

The court finds the jury's verdict was not the result of passion, partiality, prejudice, or an award for mental distress or grief suffered by this very close family.  The jury's verdict was a deliberate and analytical

application of the elements of damages in this wrongful death case. (Docket 189 at pp. 31-32). The verdict is neither shocking, unreasonable, nor outrageous. <u>Weidner</u>, <u>supra</u>. The jury's verdict is consistent with the evidence and is affirmed. <u>Reinfeld</u>, <u>supra</u>.

Defendant's motion for new trial on this ground is denied.

### ORDER

Based on the above analysis, it is hereby

ORDERED that defendant's motion (Docket 211) to set aside the verdict and for judgment as a matter of law under Fed. R. Civ. P. 50(b) is denied.

IT IS FURTHER ORDERED that defendant's motion (Docket 211) for a new trial under Fed. R. Civ. P. 59 is denied.

Dated January 16, 2013.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE